43 So.2d 18

**SMITH v. TOWN OF VINTON.**

No. 39098.

June 30, 1949.
Rehearing Denied Nov. 7, 1949.

Melvin H. Wetherill, Lake Charles, for defendant-appellant.

Thompson, Lawes & Cavanaugh, Lake Charles, Robert P. Hunter, Shreveport, for plaintiff-appellee.

HAMITER, Justice.

Previously, this case, in which plaintiff seeks recovery of $3986.09 for work performed (including materials furnished) on defendant's electrical distribution system, came before us on exceptions of no right and no cause of action directed at the allegations of the petition. 209 La. 587, 25 So. 2d 237, 238. With reference to those allegations, to quote from our reported opinion, we observed:

"To summarize the petition's substantial factual averments, which are to be accepted as true for the purpose of considering defendant's exceptions, plaintiff on March 20, 1944, entered into a verbal contract with

W. J. Romero, Mayor of the Town of Vinton, for his furnishing of the labor and equipment necessary in the repair of the electrical distribution system owned and operated by that municipality, he to be paid weekly as the work progressed. The Mayor, at the time, represented that he was duly authorized to make the contract and to proceed with the work, and further that an emergency existed because the system was in a condition dangerous to life and property; on all of which representations plaintiff relied. Defendant used the distribution system not only for municipal purposes, but also in furnishing electricity to the inhabitants of the town and to persons residing outside of its corporate limits.

"Pursuant to the contract plaintiff commenced the repair job on March 27, 1944, and continued it until April 11, 1944, at which time he was forced to cease his work because of defendant's failure to make any of the agreed payments. For the labor, materials and equipment furnished and used between those dates defendant is indebted to plaintiff in the sum of $3986.09.

"Throughout the construction period all of the members of the Town Council witnessed the performance of the work and knew that the repairs were being made. Also they knew that the system was in a condition dangerous to life and property, that an emergency existed, and that plaintiff had been authorized by the Mayor to proceed with the undertaking. Notwithstanding such knowledge, not one offered

any protest or objection. Defendant has used and is using the construction work performed on the system and is reaping the benefits of the labor, materials and equipment furnished by plaintiff at his cost and expense.

"After specially pleading estoppel, plaintiff prayed for judgment on the contract in the sum of the alleged indebtedness, or, alternatively, on quantum meruit for the amount of the claim."

At the former hearing, under the exceptions, defendant contended that there had been no compliance with the provisions of Act No. 73 of 1926, as amended by Act No. 127 of 1940, which required a contract for public work exceeding the sum of $500 to be awarded to the lowest responsible bidder after advertisement. Since the petition had alleged that plaintiff's contract provided for the making of repairs to the system, with reference to which an emergency existed because it was in a condition dangerous to life and property, that contention was held untenable under the provision of Section 1 of such statute reciting " * * * that the procedure herein shall not be necessary in cases of extreme public emergency or for labor necessary and used in the maintenance of public works built and completed."

Further, at the former hearing, defendant argued that the petition failed to disclose a cause of action inasmuch as it did not allege the granting of authority by defendant's Board of Aldermen for the Mayor's entering into the agreement with plaintiff. In answer to this argument we said:

" * * * As a general rule a Mayor acting alone is without power to execute a contract incurring a debt on the part of his city or town. He can act only with and under the authority, usually evidenced by a resolution or ordinance, of the Board of Aldermen. But when with the full knowledge of all the members of that Board, and with no objection or protest being voiced by any of them, the Mayor contracts for and engages in the making of necessary repairs to a municipally owned and operated utility, the town upon being sued on the contract will not be permitted, rather it is estopped, to urge lack of the Mayor's authority in the incurring of the debt. Especially is this true when the work performed is used for the advantage and benefit of the town. * * * A situation of the kind just described is alleged in the petition of this cause; whether plaintiff can prove his allegations is a question which is not before us. If true, and they are deemed so for the purpose of this consideration, his special plea of estoppel must be sustained."

The exceptions of no right and no cause of action were overruled and the case was remanded for further proceedings.

On a trial of the merits, following the remand, there was judgment in favor of plaintiff for $2716.67.

From that judgment defendant is appealing. Plaintiff has answered the appeal praying that the judgment be amended so as to sustain his plea of estoppel and to award the amount demanded in his petition.

As disclosed by his written reasons for judgment the trial judge found as a fact (and the record sustains the finding) that the work performed by plaintiff was pursuant to a verbal agreement with defendant's Mayor; that the council members, although not having authorized it, had knowledge that plaintiff was engaged in carrying out the agreement and offered no protest until April 10, 1944, or one day prior to the cessation of the work; and that plaintiff's efforts and undertaking inured to the benefit of defendant, the Town of Vinton.

If lack of authority from the members of the town council were the only irregularity attending the confection of the Mayor's contract with plaintiff, this defendant, in view of the mentioned circumstances and as pointed out in our former opinion, would be estopped to deny plaintiff's claim in its entirety. But the agreement in question was affected with another, and a more serious, irregularity, one that rendered it void ab initio. It was an absolute nullity, of the kind that cannot be ratified, either expressly or impliedly, and to which the doctrine of estoppel has no application.

In addition to providing for the making of repairs to the electrical distribution system necessitated by the existence of an emergency, as alleged in the petition, the contract entered into between plaintiff and defendant's Mayor contemplated, as the record discloses, the rebuilding of the entire system, for all of which a price estimated at approximately $25,000 was to be paid. With reference to this agreement plaintiff testified:

"Q. Mr. Smith, what were the terms of this agreement with Mr. Romero personally? A. We agreed to start the emergency work right away and to submit to the Council the plans for the rebuilding of the entire system and that we would start that work promptly, that they were afraid the water sytem would fail and they might have a fire and cause a lot of damage.

"Q. I believe you stated that the terms you agreed on were $500 a day, each day? A. $500 a job. The Mayor told me that he could authorize emergency repairs up to $500 a day, but we were to make these repairs in jobs, keep each job separately, and not to do over $500 work on one job; in other words, segregate it in sections under $500.

"Q. Well, your petition states that it was up to $500 a day. Did you intend to complete approximately one job a day? A. Well, that would depend on whether we had the material or not. We couldn't start off with $500 a day, because we had to start at the bottom and work the thing up as we got the materials in to rebuild it.

"Q. (By Mr. Savoy) Mr. Smith, what did you estimate the whole job would cost? A. $25,000.

"Q. Have you had much experience in contracting? A. About thirty years, yes, sir.

"Q. Have dealt with towns to a great degree or not? A. No, sir, I hadn't had any dealing with towns in some time.

"Q. (By Mr. Wetherill) $25,000 contemplated the rebuilding of that system, didn't it, Mr. Smith? A. Yes, sir.

"Q. Not just ordinary maintenance? A. No, sir.

&ast; &ast; &ast; &ast; &ast; &ast;

"Q. Mr. Smith, I believe just before the Court adjourned you stated it was your intention to do the emergency work and then to get authorization of the Council to do the rebuilding work? A. Yes, sir.

"Q. Now let me ask you, Mr. Smith, was it not the intention to submit the whole thing at one time for their approval, that is the emergency and the other as one job? A. Well, the way the thing was, it was sort of all tied in together so that you couldn't hardly separate it; the manner in which the work had to be done, the two things were tied together so that you couldn't separate them."

In connection with the rebuilding program, according to the evidence, plaintiff caused to be made a survey of the entire system, the engineer's fee of $499 for which he included in the amount demanded in this action. Further, the record discloses that some of the other work performed by plaintiff, and for which he seeks recovery here, did not relate to emergency repairs.

From all of which it must be concluded that the single agreement in question (clearly there was only one) concerned primarily the rebuilding of defendant's entire electrical system at a cost of approximately $25,000, and that the making of emergency repairs was merely incidental to that principal undertaking. This being true there is applicable here Act No. 73 of 1926, as amended by Act No. 127 of 1940, Section 1 of which states in part: "All public work to be done, exceeding the sum of five hundred dollars, by any parochial, municipal or other public corporation or political subdivision of the State, or the purchase of materials or supplies, to be paid out of public funds, shall be advertised and let by contract to the lowest responsible bidder, who has bid according to the contract, plans and specifications as advertised; &ast; &ast; &ast;." And since admittedly there was no compliance with that requirement the contract between plaintiff and defendant was rendered illegal by Section 5 of the same statute which states: "Any purchase of materials or supplies, or any contract entered into for the construction of public works, contrary to the provisions of this Act shall be null and void."

A nullity of like character was involved in Boxwell et al. v. Department of Highways, 203 La. 760, 14 So.2d 627, 631.

Therein the plaintiffs sought recovery for certain sales of materials made to a public body, at prices in excess of $500, without advertisement and competitive bidding as required by the above referred to statute. In declaring the sales null and void, and with reference to the mentioned statutory provisions, we observed:

"This statute in so far as it requires advertising and the obtaining of competitive bids is. a prohibitory law founded on public policy. It was enacted in the interest of the taxpaying citizens and has for its purpose the protecting of them against contracts of public officials entered into because of favoritism and involving exorbitant and extortionate prices. It was not passed for the benefit of the officials and the entities which they represent.

"A contract made in violation of that statutory requirement is wholly illegal. * * *"

However, since the transactions involved in the Boxwell case were merely malum prohibitum, not malum in se, and further since no fraud was practiced and the purchasing public body and the people represented received the benefits (a similar situation exists here), the plaintiffs were allowed recovery, under the unjust enrichment theory of the civil law, for the actual cost to them of the materials. As to this we said:

"Under these circumstances it would clearly be unjust to permit the Commission to reap the mentioned benefits and escape liability for them altogether. There is imbedded deeply in our civil law the maxim that no one ought to enrich himself at the expense of another. Revised Civil Code, Article 1965. On the other hand, considering the law's expressed prohibition for making the sales in the manner shown it would also be improper for the vendor to profit by the transactions.

"Equity would favor, we think, the placing of the parties in the positions that they occupied prior to the carrying out of their engagements, or in other words in status quo; but, of course, this is impossible because of the materials having been used. The only alternative is to compel payment by the vendee, or its successor, of an amount that represents the materials' actual cost to the vendor, without allowing any profits on or expenses connected with the sales. . .

*      *      *      *      *      .*

"An enforced settlement of this kind not only does justice and equity between the parties, but also it provides the protection to the taxpayers that the statute under consideration contemplates. At the same time it is notice to contractors and furnishers of materials that their dealings in the future with public agencies must be conducted in accordance with the law's provisions; otherwise the anticipated profits and attendant expenses will be denied them and their efforts will go for naught."

In arriving at his decision in the instant cause the district judge evidently applied the doctrine of the Boxwell case, because he denied recovery to plaintiff for items of overhead expense, traveling expense, profits, and the above referred to engineering fee, while he awarded judgment for those amounts actually expended which inured to the benefit of the defendant, they being for labor, material, insurance, and equipment rental. With such application and ruling we agree.

For the reasons assigned the judgment is affirmed.

O'NIELL, C. J., takes no part.