264 F.2d 695
 HOUSING AUTHORITY OF The CITY OF OPELOUSAS, LOUISIANA, Appellant,
v.
PITTMAN CONSTRUCTION COMPANY, Inc., Appellee. and
PITTMAN CONSTRUCTION COMPANY, Inc., Appellant,
v.
HOUSING AUTHORITY OF The CITY OF OPELOUSAS, LOUISIANA and George G. Marquette, Jr., d/b/a Marco Construction Company, Intervenor, Appellees.
 No. 17584.
 United States Court of Appeals Fifth Circuit.
 March 10, 1959.
 
 Joe J. Tritico, Warren E. Hood, Lake Charles, La., for defendant-appellant.
 Gerald J. Gallinghouse, New Orleans, La., R. Emmett Kerrigan, Frank J. Peragine, Deutsch, Kerrigan & Stiles, New Orleans, La., of counsel, for appellees.
 Before HUTCHESON, Chief Judge, and BROWN and WISDOM, Circuit Judges.
 WISDOM, Circuit Judge.
 
 
 1
 Pittman Construction Company, Inc., the lowest bidder[1] on a contract for the construction of a housing project at Opelousas, Louisiana,[2] sued to annul the contract awarded the next low bidder, Marco Construction Company. The question for decision is whether the Housing Authority of the City of Opelousas, through its Board of Commissioners, exercised a reasonable discretion, within its authority under the Louisiana Public Works Act,[3] in rejecting the lowest bid proposal on the ground that Pittman was not a "responsible bidder".
 
 
 2
 The case was tried to the Court. After a long trial, the district judge made detailed findings of fact and conclusions of law covering all important issues. He held that the Board's "determination was not the exercise of a sound discretion * * * was not based on good, reasonable and sufficient reasons nor sustained by the evidence * * * but was unreasonable and must be set aside". We cannot say that any material finding of fact was clearly erroneous.[4] And, we agree with the trial judge's conclusions of law.
 
 
 3
 * In this case we have two important principles working at cross-purposes. A public works statute vests discretion in an awarding board. When the board acts fairly and honestly within the reasonable exercise of a sound discretion,[5] the board's award should not be interfered with by the courts. Public administration would be hamstrung if courts were free to second-guess reasonable administrative decisions. Cutting across this principle, and no less important, is the public interest of the state in securing honest competition and in protecting taxpayers from the evils of favoritism and high prices in the letting of contracts for public works.[6] Our decision depends on accommodating these two principles in deciding whether the Board acted reasonably or arbitrarily in the determination of what is a responsible bidder.
 
 
 4
 In determining the lowest responsible bidder on a public works contract, responsibility is not solely a question of financial ability to perform the work.[7] Decisions in Louisiana and in other states allow an awarding body to consider skill, integrity, judgment, experience, reputation, previous conduct on contracts, and other factors bearing on a bidder's successful performance of his contract. Pittman does not question that the Board was vested with discretion to consider all the factors relevant to the responsibility of a contractor. Nor do we. Pittman argues that on the facts, and as the district court found, the Board of the Opelousas Housing Authority abused its discretion. We are required therefore to take a close look at the facts.
 
 II
 
 5
 The Opelousas Housing Authority constructs and operates low-rent housing projects[8] in cooperation with the Public Housing Administration.[9] The PHA furnishes ninety per cent of the financing and helps in the planning and supervision of such projects. Its approval is required when a construction contract is awarded.
 
 
 6
 In April 1958, the Board advertised for bids for a low rent housing project to consist of 140 dwelling units. Bids were to be opened May 8. The date was postponed to May 22 at the request of Danel-Ryder Construction Co., one of the bidders. H. B. Danel, President of Danel-Ryder, had been a member of the Board up to March 7.
 
 
 7
 May 22 the Board opened nine bids. The three lowest were: (1) Danel-Ryder — $1,112,500; (2) Pittman — $1,169,000; (3) Marco — $1,169,118. The district court found that the members of the Board were "elated" that Danel-Ryder was the low bidder. The Board went into executive session, then awarded the contract to Danel-Ryder subject to PHA approval. Award to Danel-Ryder would have been in direct violation of an express prohibition contained in the bidding documents and in the PHA annual contributions contract, forbidding a board member to acquire any interest in the construction contract within one year of termination of his membership on the Board. PHA, by telegram, reminded the Board of this prohibition, referred to the fact that PHA previously had denied the request for a waiver "for the special benefit of Mr. Danel", and refused to approve a contract with Danel-Ryder. Manifestly out of patience, PHA wired, in part: "[T]he restrictions in the annual contributions contract between PHA and the Housing Authority were well known to members of your Board, including Danel, they having been the subject of discussions, phone calls and correspondence dating back to July, 1956". PHA peremptorily concluded its telegram: "Please submit promptly your formal recommendations of an award to an eligible bidder." The Board started off therefore with something less than the exercise of a reasonable discretion.
 
 
 8
 The Opelousas low rent housing development is one of the largest construction projects ever undertaken in the area. The trial judge found that after PHA rejected the Danel-Ryder bid, the project became highly controversial; "Plaintiff, through no fault of its own, was considered an adversary of Danel-Ryder, Inc. (a local firm) in a contest over the contract". The situation became a topic of discussion on the streets of Opelousas. John Thistlewaite, editor and publisher of the Opelousas Daily World, wrote a column on the subject entitled, "The Boys are in a Dilemma".
 
 
 9
 June 2, 1958, at the Board's request, Albert Pittman (Secretary-Treasurer of the company) met with the Board. Robert F. DeJean, City Judge of Opelousas, attorney for Marco Construction Company, third low bidder, contended that Pittman was unreliable and asked that the Board postpone awarding the contract. The Board examined Pittman thoroughly with reference to: (1) the Desire Street Housing project the Pittman partnership had constructed for the New Orleans Housing Authority; (2) litigation with the Authority that arose out of that project; (3) slow payment of subcontractors and suppliers on that project. Pittman answered all questions put to him and furnished all information requested by the Board. He testified that the Board seemed satisfied with his answers.
 
 
 10
 June 4, John D. Edwards, Chairman of the Board, telephoned Marshall Amis, PHA Regional Director in Dallas. In response to a specific inquiry from Edwards, Amis stated that Pittman would be acceptable as the contractor. This was later confirmed by telegram. The Chairman of the Board had knowledge, then, on June 4, that the Desire Street litigation was not an impediment to acceptance of Pittman — as far as PHA was concerned.
 
 
 11
 At noon, June 4, Albert Pittman, accompanied by his father, Theodore Pittman (the President), Charles Pittman (Vice-President), and Slagel (an estimator) talked with Chachere, Executive Director of the Opelousas Housing Authority, while they were passing through Opelousas on their way to New Iberia. That evening in New Iberia, forty-five miles from Opelousas, Randolph McCormick, a Board member in the glass business, and the only Board member with any experience as a contractor, came to Albert Pittman's hotel room to obtain a commitment from Pittman for the glazing subcontract on a prime contract awarded Pittman for the construction of the Post Office in nearby Lafayette, Louisiana. Leo Carron, Vice Chairman of the Board, and Chachere, the Director, were with McCormick, Pittman made no commitment as to subcontract.
 
 
 12
 By the evening of June 4, therefore, three of the five Board members (the three whose names figured most prominently in opposition to awarding the contract to Pittman) and its Executive Director had expressed no dissatisfaction to the Pittmans, who had good reason to assume that the contract would be awarded to their company as low bidder.
 
 
 13
 Less than forty-eight hours later, June 6, the Board met and received certain evidence against Pittman, offered by Judge DeJean, attorney for Marco. The trial judge found that "the evidence consisted of: (a) an ex parte affidavit from one Elmore Labiche (a plumbing subcontractor for the Pittman partnership on the Desire Street housing project), which expressed an unwillingness to work for the Pittmans; (b) copies of some of the pleadings filed in the [Desire Street] litigation; and (c) other hearsay testimony". None of the representatives of Pittman were invited to this meeting, nor did they learn of it until the next day. Prior to the meeting, not one of Pittman's representatives was informed of the Labiche affidavit or of the nature of any of the unfavorable rumors about Pittman that had been reported to certain Board members. The Pittmans, therefore, had no chance to defend themselves against the charges made at this meeting of June 6, or to defend themselves against charges and rumors made to Board members on the streets of Opelousas. They were never informed that there were any irregularities in the form of their bid. The Board adopted unanimously a resolution, offered by Carron and seconded by McCormick, awarding the contract to Marco.[10]
 
 
 14
 June 9, 1958, the Opelousas Housing Authority wrote PHA to request approval of the award to Marco. As the first reason for rejecting the Pittman bid, the Board stated:
 
 
 15
 "Since the plans and specifications were given out to the prospective bidders, it has been learned that Pittman Construction Co., Inc., was involved in litigation with the Housing Authority of the City of New Orleans. By a resolution adopted on May 5, 1958, a copy of which is enclosed, the Local Board resolved that it would not award a contract to any contractor involved in litigation with the PHA. The enclosed records and documents show that such litigation exists."
 
 
 16
 Five days before, however, Edwards, President of the Board, had discussed this very matter with Amis, Regional Director of PHA. Edwards was well aware therefore that Pittman was acceptable to the PHA, in spite of the litigation over the Desire Street project. At that time, also, as all the members of the Board well knew, Pittman was constructing a large PHA project at Lake Charles, the contract for which was let after the Desire Street litigation had started.
 
 The second reason given by the Board was:
 
 17
 "The Board found certain discrepancies in the Pittman bid in the answers, or lack of answers, in the questionaire provided by the Local Housing Authority and returned with the bids. The completed questionaire submitted by Pittman consisted of the same questions contained in the blank forms provided by the local authority, but were copied on the Pittman firm's letterhead, which was used instead of the forms provided. In doing this, certain information which the Local Authority hoped to elicit from the financial report was not made available. Also, there was omitted from Pittman's questionaire, relative to contingent liabilities etc., the answers to the footnote questions appearing on page G-3 of the printed questionaire."
 
 
 18
 This makeweight argument strikes us as a palpable threshing about to find some excuse not to award the contract to the low bidder. The trial judge found that the "plaintiff's bid complied in all material respects with the contract documents as advertised". Marco's bid contained omissions similar to, and perhaps more serious than, the alleged defects in Pittman's bid.
 
 
 19
 With less alacrity than it showed in rejecting the Danel-Ryder bid, PHA finally approved the award to Marco June 25.
 
 
 20
 June 7 Albert Pittman learned of the action the Board had taken the day before. He protested by telegram to each Board member and requested a statement of the Board's position. The Board ignored this protest. June 19 Pittman's attorneys, by telegram, requested a meeting with the Board for the next day. Again, there was no answer from the Board. June 20, Albert and Theodore Pittman, with their attorney, then went to Opelousas and prevailed upon Edwards to call a meeting of the Board.
 
 
 21
 At this meeting, for the first time, the Pittmans were informed of the contents of the Labiche affidavit, and that the Board had questions concerning the plaintiff's compliance with the bid form. Edwards asked Pittman's attorney to counter the Labiche affidavit by obtaining affidavits from ninety per cent of all the subcontractors and suppliers of material for the Desire Street project. We think that this was an unfair and unreasonable request. Nevertheless, Pittman's attorney offered to obtain such affidavits, if the Board would withhold execution of the contract with Marco while they were endeavoring to obtain the affidavits. We think that this was a fair and reasonable request. This the Board refused.
 
 
 22
 Mr. Edwards made the significant statement that "the only way you [Pittman] will get the job is if the Public Housing won't okey Marco. If Fort Worth turns down Marco, we may be forced to do business with Pittman". We observe that if Pittman is not a responsible bidder then Marco is the next low bidder on the totem pole, it is not a responsible bidder if Marco is knocked off the pole.
 
 
 23
 There is a conflict in the testimony. The members of the Board and others present who testified for the defendant are well known, respected persons in their community. But Pittman's account was corroborated by a completely disinterested witness, Hugh Thistlewaite, Managing Editor of the Opelousas Daily World, who testified at the trial from notes taken at the meeting and preserved because Edwards told him that he might be called upon to testify. The trial judge found: "[t]he Pittmans and Gallinghouse [their attorney] presented a full explanation of the disputes between the Pittman partnership and the Housing Authority of New Orleans and expressed a complete and ready willingness to furnish the Board with any additional information the Board might want * * *. The Pittmans did not refuse to obtain [the] affidavits, as unfair and unreasonable as was this suggestion. In fact, they [through their attorney] expressed themselves as willing to do even this if the Board would agree to withhold execution of the contract with Marco while they endeavored to obtain the affidavits. The Board positively refused to do this".
 
 
 24
 June 25, 1958, PHA gave its approval. The Board signed the construction contract with Marco immediately. Pittman filed suit the same day.
 
 
 25
 Marco proceeded with construction before and during the trial. After the judgment, Pittman moved to amend the judgment by enjoining any further work on the project. The court denied this motion but prohibited further work during the pendency of any appeals, except certain protective work for a limited time.
 
 III
 
 26
 We turn now to Louisiana Law. The Louisiana Public Works Law, LSA-R. S. 38:2211-38:2217 provides in part:
 
 
 27
 "All public work to be done, exceeding the sum of two thousand five hundred dollars * * * by any public corporation or political subdivision of the state * * * shall be advertised and let by contract to the lowest responsible bidder who has bid according to the contract, plans and specifications as advertised; and no such public work shall be done * * * except as provided in this Part * * * (2211)
 
 
 28
 * * * * * *
 
 
 29
 "The governing authority desiring to let a contract * * * for the construction of public works, shall, in its resolution providing for the contract * * * and for the advertisement for bids, designate the time and place that the bids will be opened and the contract let; and shall at the place and time specified open the bids and let the contract. The governing authority may reject any and all bids. (2212) * * *
 
 
 30
 "* * * any contract entered into for the construction of public works, contrary to the provision of this Part shall be null and void. (2215)"
 
 
 31
 In Smith v. Town of Vinton, 1949, 216 La. 9, 43 So.2d 18, 21, the Louisiana Supreme Court described this act as:
 
 
 32
 "a prohibitory law founded on public policy. It was enacted in the interest of the taxpaying citizens and has for its purpose the protecting of them against contracts of public officials entered into because of favoritism and involving exorbitant and extortionate prices. It was not passed for the benefit of the officials and entities which they represent. `A contract made in violation of that statutory requirement is wholly illegal.'"
 
 
 33
 Discussing an earlier Louisiana public works statute, requiring a public contract to be let to the "lowest possible bidder", the court pointed out in Standard Highway Co. v. Police Jury, 1925, 158 La. 294, 103 So. 819, 821: "[This] does not mean that the contract may be awarded to an irresponsible bidder. Perhaps the word `possible' adds nothing to the already superlative, `lowest bidder.' The statute means that the lowest bidder must have the contract, if he be a responsible bidder, even though he be not the most responsible of the bidders." In that case the Police Jury (equivalent to a Board of County Commissioners) in good faith, rejected the lowest bid on a contract for gravel and awarded the contract to the next low bidder, because members of the Police Jury knew of their own knowledge that the next low bidder could furnish a better grade of gravel. In addition, the lowest bidder was a small concern and not as responsible financially as the next low bidder. Notwithstanding, the Louisiana Supreme Court annulled the contract.
 
 
 34
 The general principles applicable to this situation are discussed in St. Landry Lumber Co. v. Mayor and Board, 1924, 155 La. 892, 99 So. 687, 690. The Court said: "We agree with counsel for defendant that the responsibility of the bidder is to be determined, not alone by his financial ability to perform the work, but that his experience and reputation for satisfactory work are of equal importance." Nevertheless, said the court: "The law does not permit the arbitrary selection of one which is higher and the rejection of others which are lower, and made by persons more responsible and better qualified to do the work. In this, like all other cases, the discretion is to be exercised in a fair and legal manner and not arbitrarily. While the petition does not charge the defendants with having acted fraudulently, yet the facts alleged, if true, amount to an arbitrary abuse of discretion, and the only way to determine these issues is by a review of defendants' action after submission of the evidence."
 
 
 35
 From these and other cases it is clear that Louisiana follows the general rule of vesting an awarding body with discretion subject to judicial review. Courts will not substitute their judgment for the good faith judgment of an administrative agency, but an awarding body's administrative discretion must be exercised in a fair and legal manner and not arbitrarily.
 
 
 36
 The Board has the right to be wrong, dead wrong; but not unfairly, arbitrarily wrong.
 
 IV
 
 37
 No one questions the integrity of the members of the Board. They are highly respected men in their community who, without pay, have given long hours to improving housing in their area. The trial judge found that no member of the Board was guilty of fraud or collusion or had any wrongful intent. We agree. But hell is not paved with bad intentions.
 
 
 38
 This case can be sliced down to the Board's deciding that the low bidder was not a responsible bidder — without giving the low bidder a fair chance to disprove the charges of irresponsibility. By any reasonable standards, such action offends one's sense of fair play and is an arbitrary abuse of discretion inconsistent with the letter and the spirit of the Louisiana Public Works Law.
 
 
 39
 We do not have to weigh the rightness or wrongness of the Board's action. The district court did. The district court found that Pittman "is a responsible contractor".[11] The trial judge found also that the litigation between the Pittman partnership and the New Orleans Housing Authority "involves bona fide disputes and does not cast an unfavorable reflection on the Pittmans in any way". The trial judge brushed aside other so-called evidence of Pittman's lack of responsibility. Substantial evidence supports these findings.
 
 
 40
 We weigh and find wanting the actions of the Board bearing on how it arrived at its decision. (1) The Board took no steps to make sure that representatives of Pittman would be present at the meeting of June 6 when the Board knew that Judge DeJean intended to present certain "evidence" against Pittman. At the meeting the Board precipitately awarded the contract to Marco. (2) The Board failed to inform Pittman of the contents of the Labiche affidavit and of the other charges of irresponsibility, until after the Board made its award to Marco. (3) Conceding that the Board was in good faith, it was credulous to the point of unreasonable naivete to base its decision almost entirely on an ex parte affidavit from a disgruntled subcontractor and other hearsay "evidence" presented by Judge DeJean, attorney for Marco, the next low bidder. (4) It was arbitrary and unfair for the Board to request Pittman to produce affidavits from ninety per cent of the Desire Street subcontractors, then reject Pittman's offer to obtain these affidavits provided that the Board would hold up the execution of the contract with Marco. (5) After a close reading of the record, we find that the Board's criterion was not so much "Is Pittman responsible" as it was "Will Marco be somewhat easier to do business with; besides, the difference between Marco's bid and Pittman's is so slight as to be negligible". This thinking is inconsistent with the public policy of the state expressed in the Public Works Law.
 
 
 41
 In arriving at our conclusions we are not unmindful of the limitations inherent in administrative action of a public body. The members of the Board of the Opelousas Housing Authority are laymen. We do not expect such a Board to conduct FBI investigations, hold elaborate hearings, adhere to legal rules of evidence, and function as a judicial body. Members of public boards, however, have as well developed bumps of fairness and reasonableness as judges. In the light of what fair-minded, reasonable laymen would do, we think that before a Board disqualifies the lowest bidder as not responsible, the lowest bidder has the right to be heard and the Board has the duty to listen on the subject of responsibility. In this case the Board's failure to recognize the bidder's right to be heard prior to Board action on the charges presented at the June 6 meeting and the Board's failure to listen when it was given an opportunity to listen were an abuse of discretion.
 
 V
 
 42
 Pittman contends that the district court erred in not ordering the Housing Authority to award the contract to the plaintiff. Under the Public Works Law, and in accordance with the terms of the bid documents, the Housing Authority is authorized to award the contract to the lowest responsible bidder or to reject all bids and to readvertise for new bids. Moreover, a court should not compel a public body to make a discretionary award to a bidder not chosen by that body. State ex rel. People's State Bank v. Police Jury of Red River Parish, 1923, 154 La. 389, 97 So. 584.
 
 
 43
 Accordingly, the judgment of the district court is
 
 
 44
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 It is well established in Louisiana that an unsuccessful bidder on a contract advertised by a public board to be let to the lowest bidder or lowest responsible bidder may sue to set aside the award. State ex rel. Bank of Franklinton v. La. State Bd. of Agriculture, 1909, 122 La. 677, 48 So. 148; Sternberg v. Bd. of Commissioners, 1925, 159 La. 360, 105 So. 372; St. Landry Lumber Co. v. Mayor and Board, 1924, 155 La. 892, 99 So. 687; Standard Highway Co. v. Police Jury, 1925, 158 La. 294, 103 So. 819
 
 
 [2]
 Pittman's original complaint was to enjoin the Opelousas Housing Authority from awarding a contruction contract to Marco and to compel defendant to accept plaintiff's bid. The suit was filed the day defendant executed its contract with Marco. Pittman then filed an amended complaint asking the Court (1) to annul the contract, (2) to enjoin defendant from doing any work, and (3) to order the Authority to award the contract to Pittman
 
 
 [3]
 LSA-R.S. 38:2211-38:2217; Act 73 of 1926, as amended by Act 589 of 1954. Jurisdiction here is based on diversity of citizenship. Louisiana law controls this case under the Erie doctrine
 
 
 [4]
 Fed.Rules Civ.Proc. Rule 52(a), 28 U.S. C.A. See Cohen v. Frima Products Co., 5 Cir., 1950, 181 F.2d 324
 
 
 [5]
 "While the city council would not be justified, and the courts would intervene to protect the taxpayer in such event, to arbitrarily reject a bid, and thus defeat the object to be attained by competition, it is vested with a certain discretion in rejecting bids, which will not be controlled, when exercised with prudence in the public interests." Gunning Gravel & Paving Co. v. New Orleans, 1893, 45 La.Ann. 911, 13 So. 182, 183. "[T]here is but little dissent from the general rule that in determining who is such `lowest responsible bidder,' `lowest and best bidder,' etc., public boards and officials are vested with wide discretion, and their decision, when based upon an honest exercise of the discretion thus vested in them, will not be interfered with by the courts, even if erroneous. . . . The public authorities must always exercise a real discretion based upon facts reasonably tending to support their decision; the rule does not permit them to act arbitrarily. While an honest determination that a bidder's bid, though the lowest, is not the best, will ordinarily control, the law does not permit the arbitrary rejection of bids for public work nor arbitrary preference of one bid over another which is lower, or an arbitrary classification of bidders." 43 Am.Jur., Public Works and Contracts, Sec. 44
 
 
 [6]
 In Boxwell v. Dept. of Highways, 1943, 203 La. 760, 14 So.2d 627, 631, the court quoted from 43 Am.Jur., Public Works and Contracts, Sec. 95 as follows: "These provisions exist to protect citizen taxpayers from unjust, ill-considered or extortionate contracts, or those showing favoritism, and if the public body is suffered to disregard them and the other party permitted to recover upon an implied contract, such provisions can always be evaded and set at naught. To depart from these principles would be to open the door to abuses and practices fraught with danger to the welfare of the citizens and taxpayers of municipalities and political subdivisions of the state." See Fourmy v. Town of Franklin, 1910, 126 La. 151, 52 So. 249; Bienvenu v. Police Jury, 1910, 126 La. 1103, 53 So. 362; Sternberg v. Board of Com'rs, 1925, 159 La. 360, 105 So. 372; Smith v. Town of Vinton, 1949, 216 La. 9, 43 So.2d 18
 
 
 [7]
 The right of a public body to take into consideration a number of factors in deciding who is the "lowest responsible bidder" is noted in American Jurisprudence as follows: "The term `responsible' as thus used is not limited in its meaning to financial resources and ability. What the public desires is a well-constructed work, for which a law suit even against a responsible defendant is a poor substitute; and authorizations of this kind are held to invest the public authorities with a discretionary power to pass upon the honesty and integrity of the bidder necessary to the faithful performance of the contract — upon his skill and business judgment, his experience and facilities for carrying out the contract; previous conduct under other contracts; and the quality of previous work — as well as his pecuniary ability, and when that discretion is properly exercised the courts will not interfere." Am. Jur., Public Works and Contracts, Sec. 42 (1942)
 
 
 [8]
 Under authority of the Housing Authorities Law, LSA-R.S. 40:381 et seq., Act 275 of 1936
 
 
 [9]
 Under the Federal Housing Act, 42 U.S. C.A. §§ 1401-1433
 
 
 [10]
 In its brief the Housing Authority stated that the following factors were considered by the Authority in arriving at its decision to reject the Pittman bid: (1) The bid contained material irregularities; (2) Pittman had failed to perform properly its contract with the New Orleans Housing Authority on the Desire Street project; (3) Pittman failed to pay its subcontractors on the Desire Street project; (4) Two Opelousas prospective subcontractors advised the Board that they did not want to work for the Pittman organization; (5) The City Engineer told the Authority that he would not care to work with the Pittmans; (6) The Board acknowledged the fact that a theatre in Houma, Louisiana, constructed by one of the Pittman firms, had been defectively constructed, in that a part of the ceiling fell and injured a person inside the theatre; (7) Pittman refused to furnish affidavits from subcontractors stating that they were satisfied with the treatment afforded them by Pittman; (8) Leo Carron, a member of the Board, testified that a representative of Woodward Wight Co. of New Orleans, a supplier of material, had told him that Woodward Wight would refuse to sell material to the Pittmans; (9) John Edwards, Board Chairman, said that Mr. T. A. Pittman had tried to persuade Mr. Danel to withdraw the Danel-Ryder bid. These factors are listed here in the order in which they are listed in the brief
 
 
 [11]
 "Plaintiff is a responsible contractor. It is one of the largest general contractors in the State of Louisiana, and in general, enjoys an excellent reputation. The officers of the plaintiff company have had extensive experience in the construction industry. They appear to have specialized in large public works projects. A partial list of the construction projects completed successfully by them (over a period of time going back to 1932) aggregate some $68 million. They have the organization, equipment and technical experience to perform such work. Their financial resources are exceptionally good, as demonstrated by their ability to obtain $15 million in performance bonds. The Pittmans are prompt in payment of their obligations to subcontractors and furnishers of material. There can be no doubt of plaintiff's competence and ability to fulfill efficiently and economically the obligations imposed on the contractor by the subject contract documents. And, too, the records show that the Pittmans are considered to be able businessmen of high integrity. The financial report of the Pittman Corporation shows that the firm has multimillion dollar resources. The company is in good standing with AGC. Plaintiff has a "Triple A" rating in Dun and Bradstreet (Tr. 184). In this area at the present time, Pittman is building a U. S. Post Office at Lafayette, and a large Public Housing project in Lake Charles."