488 So.2d 705 (1986)
DAVES INSURANCE AGENCY, INC.
v.
STATE of Louisiana, Through the DIVISION OF ADMINISTRATION, Stephanie Alexander, in Her Capacity as Commissioner of Administration, Hugh M. Carleton, in His Capacity as Director of State Purchasing, John Douglas Higley, in His Capacity as Director, Office of Risk Management, and Alexander & Alexander, Inc.
No. 85 CA 1415.
Court of Appeal of Louisiana, First Circuit.
February 28, 1986.
Writ Denied May 1, 1986.
Mack E. Barham, Gail A. Nick, New Orleans, for plaintiff-appellant Daves Ins. Agency, Inc.
Kevin P. Torres, Asst. Atty. Gen., Henry D. Salassi, J. Wendell Clark, Baton Rouge, for defendant-appellee State of La., Through Div. of Admin., Stephanie Alexander, Hugh M. Carleton, John Douglas Higley, Alexander & Alexander, Inc.
Before GROVER L. COVINGTON., C.J., and WATKINS and SHORTESS, JJ.
GROVER L. COVINGTON, Chief Judge.
Plaintiff, Daves Insurance Agency, Inc. (Daves), appeals the dismissal of its suit by *706 the trial judge, which was instituted against the State through the Division of Administration, several state officials within the Division in their official capacities, and Alexander & Alexander, Inc., a competitor of plaintiff's. Plaintiff is seeking a declaratory judgment, preliminary and permanent injunctions, and alternatively, a writ of mandamus, relating to the award of a contract of insurance on state-owned vehicles for which bids were originally solicited in July of 1985. We affirm the trial court judgment dismissing plaintiff's claims.
I. Factual Summary
In his written reasons for judgment, the trial judge partially summarized the initial events herein as follows:
On July 2, 1985, the State of Louisiana, through the Division of Administration, issued an Ivitation [sic] for Bids, Proposal No. A-20, for the procurement of automobile liability insurance for various departments and agencies of the State. Bids were invited in three categories: Part I-A-Autombiles, bodily injury and property damages liability for various state agencies including the Department of Transportation and Development; Part I-BGarage liability and garage beepers' [sic] legal liability for State owned/operated vocational technical schools; and Part IIOffice of State Police/Department of Public Safety and Corrections. The Invitation for Bids was amended once, and among other changes, the request for Part I-B was deleted. Four bids were received in response to the Invitation for Bids: one from Alexander & Alexander, Inc. on behalf of the Hartford Insurance Company combining Parts IA and II; another from Alexander & Alexander, Inc. on behalf of the Hartford Insurance Company for Part IA only; and one from Wright & Percy Insurance Agency on behalf of the Travelers Insurance Company for Part II only. (There was also one from plaintiff on behalf of The Travelers Insurance Company for Part IA only.)
By letter on August 21, 1985, Hugh Carleton, Director of State Purchasing declared that the bids opened on August 9, 1985 at 10:00 a.m. had been cancelled due to the fact that "all bids exceeded available funds." Carleton declared that an emergency condition was created by the situation, and approved on [sic] Emergency Procurement for a term of ninety (90) days of such insurance to enable the State to rebid the coverage. However, although this letter was dated August 21, 1985, emergency solicitations were made by phone to several agencies prior to that date, and in fact the emergency contract which was awarded to Alexander & Alexander, Inc. actually became effective on August 20, 1985. This coverage was for two months, expiring October 20, 1985 at a cost of $940,000.00 per month.
Plaintiff prays for a declaratory judgment decreeing that the cancellation of Proposal A-20 was invalid and void, that Daves was the lowest responsive, responsible bidding [sic] and that the declaration of emergency and its resulting emergency contract is null and void. Plaintiff also requests preliminary and permanent injunctions forcing the State to award the contract to Daves under Proposal A-20, and preventing the State from acting pursuant to the emergency solicitation and from issuing a second solicitation, or alternatively, a writ of mandamus to award the contract to Daves.
The plaintiff's bid on Part I-A only was for a $7,899,787.00 annual gross premium, while that of Alexander & Alexander, Inc., was for a $7,734,054.00 annual gross premium. It is plaintiff's position that its bid was the low bid, despite the difference of $165,743.00 in the annual premiums, because its per unit (vehicle) rate was $608.14 for the 12,990 vehicles specified in the Invitation for Bids. However, the per unit bid of $641.99 by Alexander and Alexander, Inc., was based on fewer vehicles12,047; the difference between the vehicle numbers was the omission of "nonratable" vehicles which would be covered by the policy, but *707 not included in the calculation of the premium, such as two-wheel trailers.
This breakdown of the gross annual premium into a per unit figure becomes important in light of plaintiff's contentions that the cancellation of bids was improper, and that because the method of evaluating the bids by the Office of Risk Management was not in accordance with its own guidelines, Alexander & Alexander was erroneously determined to be the low bidder on Part I-A.
II. Issues and Analysis
A. Cancellation of the Bids on Proposal A-20.
The first issue raised by plaintiff requiring resolution is whether the cancellation of the bids on Proposal Number A-20 was invalid. The State's position is that because all bids received exceeded the available funds which had been budgeted by the various state agencies for auto insurance, the cancellation was the only proper course of action. Plaintiff contends that there was sufficient money available to pay the cost of the premiums, and thus, the cancellation had no valid basis, citing provisions of the Procurement Code and Purchasing Rules and Regulations of the Division of Administration to support its position.
Most of the witnesses who testified at the trial of this matter were state employees and officials within the Division of Administration and the Office of Risk Management. The testimony was uncontradicted that for the 1985-86 insurance year[1], the various agencies throughout the state had allowed in their budgets the amount of $518.00 per vehicle for automobile liability insurance premiums. As stated previously, the bid submitted by plaintiff was for a $608.14 per unit premium, and that of Alexander & Alexander was for $641.99. Thus, the only two bids received on this part of the Proposal were considerably higher than the amount allocated in each agency's budget.
Plaintiff focuses its argument on the testimony and evidence indicating that as of June 30, 1985, the cash and investments in the state treasury reserved for the use of the Office of Risk Management (the agency within the Division of Administration responsible for handling the bids in question and for the purchase of the state's insurance) totalled $24,518,346.04. Plaintiff also makes much of the testimony of the Chief Budget Officer for the state, Ralph Perlman, on the following points: (1) that the Office of Risk Management could warrant the state treasurer for funds in whatever amount was on deposit in the Treasury; and (2) that within each executive agency's budget for operating services is a category for insurance which includes all types of insurance, from workers' compensation to auto liability, and that it is possible for an agency to use the funds earmarked for one type of insurance to meet increased costs of another type. Finally, plaintiff claims that the payment for temporary emergency coverage in the amount of $723.00 per vehicle for two months[2], or a total of $1,880,100.00, proves that the money was available for payment of the insurance premiums as bid by plaintiff.
Plaintiff cites Section V of the Purchasing Rules and Regulations promulgated by the Division of Administration pursuant to La.R.S. 39:1599 in support of its position. Section V provides:
Solicitation should only be issued when there is a funded, valid need unless the solicitation states that it is for information purposes only. Preparing and distributing a solicitation requires the expenditure of Louisiana time and funds. Businesses likewise incur expense in examining and responding to solicitations. Therefore, although issuance of the solicitation *708 does not compel award of a contract, a solicitation is to be cancelled only when there are cogent and compelling reasons to believe that it is in Louisiana's best interest.
Plaintiff also cites La.R.S. 39:1594(G), which provides as follows:
The contract shall be awarded with reasonable promptness by written notice to the lowest responsive and responsible bidder whose bid meets the requirements and criteria set forth in the invitation for bids. Awards shall be made by unconditional acceptance of a bid without alteration or correction except as authorized in this Part.
Our review of the record convinces us that the State was not clearly erroneous in reaching its determination that all bids on Proposal A-20 must be rejected since they exceeded the amount of the funds available for such purpose. While the record shows that there was a sufficient amount of money for the Office of Risk Management to pay the premiums in the amount bid by Daves Insurance Agency, Inc., or by Alexander & Alexander, Inc., it was the consensus of those state officials who testified that, to accomplish this result, money allocated for other budgetary purposes would have to be used to pay the premiums. This adjustment of the budget was not feasible. There was some evidence to the effect that this practice had been followed in the past by the Office of Risk Management, and that this practice was still followed in another executive department; however, this practice was considered to be unsound, and the Office of Risk Management had been officially instructed to discontinue such a poor management practice.
Moreover, although there are undoubtedly funds on deposit in the state treasury for the Office of Risk Management, it was the testimony of the state's Director of Budget and Fiscal Management that these funds are already encumbered for the normal operating expenses of that office, and must cover everything it does, including administrative overhead, travel expenses, contractual services, and workers' compensation. His testimony was substantiated by the Assistant Commissioner of the Division of Administration, Jessie Smallwood, and the state's Risk Manager, Douglas Higley. Thus, it is not within the province of the Office of Risk Management to simply write a check for payment of insurance premiums, without regard for the consequences, when to do so would require ignoring the budget.
Finally, we address the plaintiff's argument that by paying $1,880,100.00, or $723.00 per unit for temporary insurance premiums, the Office of Risk Management proved it could pay $7,899,787.00, or $608.14 per unit for insurance premiums in accordance with plaintiff's bid. Basically, the plaintiff contends that the payment by the state to Alexander & Alexander, Inc., for the temporary insurance coverage proves that sufficient funds existed to pay for the premiums as bid by the plaintiff.
Two checks totalling $1,880,100.00 were issued by the state for payment of the coverage: one on August 26, 1985, for $940,000.00, and one on September 11, 1985, for $940,100.00. The temporary coverage provided by Alexander & Alexander, Inc., included State Police vehicles as well as other state vehicles. The per unit cost of this policy was $723.00 to compensate for the higher risks attendant to that fleet of vehicles. Thus, these per unit figures cannot be used for comparison with plaintiff's bid, since plaintiff's bid excluded coverage for the State Police vehicles. It is true that if the term of the temporary coverage were to be extended for an entire year, the total annual cost would be greater than the amount budgeted. However, the payment of $1,880,100.00 does not exceed the amount that would have been required under plaintiff's bid of $7,899,787.00. Thus, plaintiff's argument here has no merit.
B. Declaration of Emergency Situation
Plaintiff also contends that the proper procedures were not followed in declaring an emergency situation. Specifically, *709 it complains that the emergency solicitation of bids was issued without prior written approval of the Chief Procurement Officer, and was therefore null and void, citing La.R.S. 39:1598, which states:
A. Conditions for use. The chief procurement officer or his designee above the level of procurement officer may make or authorize others to make emergency procurements when there exists an imminent threat to the public health, welfare, safety, or public property under emergency conditions as defined in accordance with regulations.
B. Written quotations. Every effort shall be made to obtain quotations from three or more vendors when supplies, services, or major repairs are to be purchased on an emergency basis, except for standard equipment parts for which prices are established. Immediate purchasing shall be discouraged as much as is practicable. When supplies, services, or major repairs are urgently required and time does not permit the obtaining of written quotations, the procurement officer may obtain quotations by telephoning or otherwise, but such quotations shall be made on the relative purchase requisitions. So far as practicable, quotations shall be secured from institutions of the state as provided by law.
C. Determination required. The Chief Procurement Officer shall make a written determination of the basis of the emergency that includes the facts and circumstances leading to the conclusion that such procurement was necessary as well as a written determination detailing the steps taken prior to selecting a particular contractor and the basis for the final selection.
The written determination shall be included in the contract file either prior to contracting or as soon thereafter as practicable.
Plaintiff argues that "[n]othing, nowhere permits the State or any public official to proceed with an emergency procurement without prior written approval from the Chief Procurement Officer certifying that an emergency does in fact exist and why." Such an argument ignores the plain language of Subsection A, which says: "The chief procurement officer ... may make or authorize others to make emergency procurements when there exists an imminent threat to the public health, welfare, safety, or public property under emergency conditions ..." [Emphasis ours.]
It was the testimony of Hugh Carleton, the Director of State Purchasing and Chief Procurement Officer, that he was out of his office on the afternoon of August 16, 1985, when his office received the phone call from the Office of Risk Management first explaining that the State's liability insurance coverage would expire on August 20, 1985, and that it would be necessary to immediately obtain some interim coverage until the problem of cost could be resolved. Mr. Carleton stated that, in his absence, his deputy, Ms. Virgie LeBlanc, handled the call and gave oral approval to the Office of Risk Management to proceed with emergency action. An insurance binder was issued by Alexander & Alexander, Inc., on August 19, 1985. On August 20, 1985, a written letter from the Office of Risk Management was received by Mr. Carleton detailing the substance of the telephone conversation of August 16, 1985, and he issued a written authorization on August 21, 1985, in accordance with the oral authorization given by his deputy in his absence on August 16, 1985.
Subsection C of R.S. 39:1598 requires the Chief Procurement Officer to "make a written determination of the basis of the emergency" which "shall be included in the contract file either prior to contracting or as soon thereafter as practicable." [Emphasis ours.] In view of the language quoted above, plaintiff's argument that the steps taken by the defendants were illegal, rendering the emergency procurement invalid, is unpersuasive. The "either-or" language of Subsection C clearly encompasses circumstances in which the time factor would not permit completion of all required paperwork before making an emergency procurement. It was the testimony of Mr. *710 Carleton that there was nothing unusual about approving emergency action in this way in the normal course of business in state purchasing, and that at times, when emergencies occurred in the middle of the night, it was necessary for action to be taken even before his office could be contacted for approval. In such instances, approval was given after the fact.
Here, where a period of only four working days was involved and considering the steps taken in view of the language of Section 1598(A) and (C), we cannot say that this statute was violated. The written determination required was completed and received within three working days after the emergency was first made known to the office of the Director of State Purchasing. We will not determine here what number of days may be an acceptable interpretation of the "as soon thereafter as practicable" language of Subsection C. It is sufficient to say that under the circumstances of this case, the written determination issued on August 21, 1985, was in compliance with statutory requirements.
C. Evaluation of the Bids
Since we have already determined that the cancellation was the proper course of action on the part of the Office of Risk Management, and the subsequent declaration of emergency an appropriate response, we need not here determine who was the low bidder on a bid proposal which was rejected because all bids were too high. However, plaintiff's contention that the Office of Risk Management personnel violated its own rules and regulations in evaluating the bids, and that this action, which was contrary to law, is a sufficient ground for injunctive relief, merits discussion.
The alleged violations occurred when the bid of Alexander & Alexander, Inc., on Part IA was being evaluated. In the Invitation for Bids, the number of vehicles specified for coverage was given as 12,990. The Invitation specified at page 15, Section 4.3, that a contractor (not bidder) would be required to provide its per unit rate to the Office of Risk Management no later than the time the invoice for the annual premium was submitted. However, the bid quotation form also contained a space for the per unit rate from the prospective contractor, or bidder.
The bids were evaluated based on the total annual premiums, not a per unit rate. Plaintiff contends that this was a violation of Section I(K)(2)(b)[3] of the Purchasing Rules and Regulations, which deals with recalculation of bids where there is an apparent error in the extension of per unit price to a total price.[4] The apparent error plaintiff points to is the fact that if Alexander & Alexander, Inc.'s $641.99 per ratable vehicle, per unit rate listed, is multiplied by 12,990, the number of vehicles specified in the Invitation for Bids to receive coverage, the total annual premium is $8,339,450.00, rather than $7,734,054.00.
Alexander & Alexander, Inc., contends that there was no error in calculation; that the discrepancy is due to its use of a smaller figure than 12,990 vehicles for coverage because some of those listed by the State are vehicles for which no premium is charged, such as two-wheeled trailers attached to motorized vehicles, and are therefore non-ratable, although they do receive coverage. The Invitation prepared by the State included a breakdown of the types of vehicles to be covered. The bid quotation form submitted by Alexander & Alexander, *711 Inc., does indeed contain the information on the rate per vehicle space: "0.00 per non-ratable unit" just under the figure "641.99 per ratable unit."
The testimony of the Assistant Commissioner and of the State's Property and Casualty Insurance Underwriter was that the total annual premium price was used to evaluate the bids. This was in accordance with Section 4.3 on page 15 of the Invitation, which states: "The total annual premium reflected on the latter page will be used to evaluate the bids and determine the low bid."
In this situation, we cannot say that there was a violation of the Purchasing Rules and Regulations by those personnel who evaluated the bids. So far from being non-responsive, the bid of Alexander & Alexander, Inc., seems more responsive by attempting to analyze more deeply the State's needs in auto insurance. Furthermore, if the state personnel's reliance on total annual premium costs, rather than per unit costs, had been in error and in violation of the rules and regulations, this specific violation would not have availed plaintiff any injunctive relief under the facts of this case, where there was overwhelming evidence that none of the bids on Proposal A-20 could be accepted due to budgetary considerations.
III. Mootness
The plaintiff is correct in its contentions that with regard to public bid law, improper letting of a contract to one other than the low bidder, does not render the low bidder's request for injunctive relief moot, even where a contract has already actually been performed. Haughton Elevator Division v. State of Louisiana, Through The Division of Administration, 367 So.2d 1161 (La.1979); Housing Authority of Opelousas v. Pittman Construction Company, 264 F.2d 695 (5th Cir. 1959). Thus, although the emergency insurance policy resulting from cancellation of Proposal A-20 has already expired, plaintiff was entitled to consideration of its claims. However, for the reasons stated heretofore, we cannot say the trial court was in error in dismissing plaintiff's suit.
The decision of the trial court is affirmed; costs of the appeal are assessed to plaintiff-appellant.
AFFIRMED.
NOTES
[1] The policy of insurance on state-owned vehicles in effect at the time was to expire on August 20, 1985.
[2] Although the declared period for which the emergency coverage was to be ninety days, the policy in question provided by Alexander & Alexander, Inc., actually existed from August 20, 1985, through October 20, 1985, a period of two months.
[3] Section I(K)(2)(b) of the Purchasing Rules and Regulations of the Division of Administration provides as follows:

If the mistake and the intended bid are clearly evident on the face of the bid document, the bid shall be corrected to the intended bid and may not be withdrawn. Examples of mistakes that may be clearly evident on the fact of the bid document are typographical errors, errors in extending unit prices, tranposition errors, and arithmetical errors. When an error is made in extending total prices, the unit bid price will govern. Under no circumstances will a unit bid price be altered or corrected.
[4] Plaintiff's own bid contained an apparent error; its per unit rate, $608.14, multiplied by 12,990 vehicles, resulted in a total annual premium of $7,899,738.60, rather than the $7,899,787.00 listed on the bid quotation.