292 So.2d 536 (1973)
Succession of Freddie Robertson KILLINGSWORTH.
Mrs. Rome Schlater Johnston TUTTLE et al.
v.
Edward Hill SCHLATER et al.
Nos. 53128, 53156 and 53171.
Supreme Court of Louisiana.
September 24, 1973.
On Rehearing March 25, 1974.
Rehearing Denied April 26, 1974.
*537 Charles H. Dameron, Currett, Hardin, Hunter, Dameron & Fritchie, Baton Rouge, applicants in 53128.
Robert J. Vandaworker, Taylor, Porter, Brooks & Phillips, Baton Rouge, applicants in 53171.
Byron R. Kantrow & Gerald L. Walter, Jr., Kantrow, Spaht, Weaver & Walter, Baton Rouge, for appellees Schlater, Appleton, Mitchell, Melton and others.
John D. Kopfler, John D. Kopler & Associates, Victor A. Sachse, Frank P. Simoneaux, Paul M. Hebert, Jr., Breazeale, Sachse & Wilson, Baton Rouge, for applicants in 53156.
CALOGERO, Justice.
This protracted litigation has been heard twice in the District Court and twice in the Court of Appeal. See Succession of Killingsworth, and Tuttle v. Schlater, 194 So.2d 331 (La.App. 1st Cir., 1966); Succession of Killingsworth, and Tuttle v. Schlater, 270 So.2d 196 (La.App. 1st Cir. 1972). Upon application for writs after the first Court of Appeal decision, we refused to grant, 250 La. 175, 194 So.2d 738 (1967). The matter is now before us because following the second decision of the Court of Appeal we granted writs. 273 So.2d 292, 293 (La.1973).
The proceedings which have heretofore transpired, the contentions asserted, disposition of those contentions and holdings of the various courts (evident from a reading of the cited opinions) will not be restated *538 herein except to the extent necessary to discuss the issues presently before us.
For convenience in this opinion, we will refer herein to the following parties or factions as follows: Mrs. Leila Obier Cutshaw and W. P. Obier, Jr. are the legal heirs of Mr. W. P. Obier, (deceased attorney and Notary Public who executed the will of Mrs. Killingsworth) and will be referred to hereinafter as the Obier heirs; Mr. W. B. Middleton, Jr. is an attorney who had formerly been the law partner of Mr. Obier; St. Paul Fire and Marine Insurance Company is the professional liability insurer of Mr. Obier, Mr. Middleton, and the former law partnership designated Obier & Middleton and will be referred to as St. Paul; Mrs. Rome Schlater Johnston Tuttle, Mrs. Mary Lewis Johnston Rowe, Mrs. Winona Johnston Bell, Mrs. Nona Mae Bronner Miller and Mrs. Barbara Jean Bronner Norton are legal heirs of Mrs. Freddie Robertson Killingsworth, who were designated as the principal legatees under the will of Mrs. Killingsworth (all of the foregoing parties are proponents of the will, validity of which is at issue in this litigation); Edward Hill Schlater, Sarah Elizabeth Schlater Appleton, Mary Blewett Mitchell, Frances S. Melton, Mildred T. Landers, Frederick M. Schlater, Thomas Wessinger Schlater, Mary Hughes Schlater Stumb, John Day, Mary Alice Day, and Frank V. LeBlanc are other legal heirs of Mrs. Killingsworth (principally nieces and nephews) who were not designated as legatees in the will of Mrs. Killingsworth (they are opponents of the will). Mrs. Tuttle, et al, will be referred to hereinafter as legatees.[1] Edward Hill Schlater, et al, will be designated hereinafter as legal heirs.[2]
The principal contest in this litigation has to do with the validity of the will of Mrs. Killingsworth which was executed as a nuncupative will by public act before Mr. Obier on October 7, 1955.
When first confronted with the issue, posed by various exceptions, the trial court determined that the will would be valid even if typed by Mr. Obier's secretary. The judge therefore invited a motion for judgment on the pleadings, then rendered a judgment declaring the will valid.
On appeal from this judgment (on the pleadings) the Court of Appeal reversed, held that a will would be invalid for failure to comply with a requirement of Article 1578 of the Civil Code (that it be "written" by the Notary) if it were in fact typed by the Notary's secretary.[3] Upon application for writs to this Court we denied, with the comment that "we find no error of law in the judgment complained of." 250 La. 175, 194 So.2d 738 (1967).
After remand the case was tried on the merits. The trial court admitted evidence over objection, concerning the confection of the will, and concluded that the will was indeed invalid because it had been typed by Mr. Obier's secretary, and because such did not constitute "written" by the Notary as required by Article 1578 of the Civil Code. On appeal the First Circuit Court of Appeal affirmed the judgment in this respect, holding the will invalid. There were and are, of course, incidental issues for decision which will be discussed more fully hereinafter. We granted writs on application *539 of Mr. Middleton and St. Paul (#53,128 on our docket) the legatees (#53,156) and the Obier heirs (#53,171), all of them proponents of the will.
The specific supplemental issues for decision by this Court will, as indicated, be considered hereinafter. At the outset however, we must dispose of the primary issue in this litigation which has to do with the validity of the will under attack. The Obier heirs, Mr. Middleton, St. Paul and the legatees, while denying that the will was typed by Mr. Obier's secretary, urge that we hold the will valid even assuming that it had been so typed.
They contend that the disposition of these issues by the Court of Appeal's first decision was not final because the case then was on appeal only on exceptions and motion for judgment on the pleadings, the case since then having been fully tried on the merits. They also take the position that our earlier refusal to grant writs does not bar our reconsideration of the issue (that a secretary's typing the nuncupative will by public act, if it be so found, strikes it with invalidity) because the earlier refusal does not constitute the "law of the case". In this regard they call our attention to Day v. Campbell-Grosjean Roofing and Sheet Metal Corp., 260 La. 325, 256 So.2d 105 (1972).[4] Our present resolution of this issue, in effect affirming our earlier decision in refusing to grant writs, pretermits any need to consider whether we may properly rule contrary to the earlier decision.
Proponents of the will argue here, essentially as they did in 1967 (both before the Court of Appeal and on writ application to this Court) that the right of testamentary disposition is strongly provided by our law as a clear and distinct corollary of the right of property (Kingsbury v. Whitaker, 32 La.Ann. 1055, 1880); that statutory interpretation should carry out the general social purpose of legislation (22 La.L.Rev. 727); that there is a strong presumption of a will's validity where on its face all of the formalities of a nuncupative will by public act have been complied with (Succession of Watson, La.App., 157 So.2d 612, 1963 and Renfrow et al. v. McCain, 185 La. 135, 168 So. 753, 1936); that this Court's decision in Knight v. Smith, 3 Mart.O.S. 156 (1813), invalidating a nuncupative will by public act because there written by the Notary's clerk, is outmoded and inappropriate; and that Prudhomme v. Savant's[5] validation of a nuncupative will by public act typed by the Notary, in 1922, presages the "logical" extension that typed by the secretary should be construed as written by the Notary, particularly since Article 1578 merely requires written by the Notary, not written "by the hand of" as is required of the testator in an olographic testament (C.C. Art. 1588).
We find no more merit in these arguments than the Court of Appeal, and this Court, did, in 1967.
Civil Code Article 1578 requires that the nuncupative will by public act must be received by the Notary as dictated by the testator, "and written by the notary as it is dictated." (Emphasis supplied) The statutory language is much too clear to permit the strained interpretation that "written by" means, permissibly, authored by, or dictated to secretary by, the Notary.
Proponents' alternate contention on the will's validity (or primary contention depending on the emphasis) is that the will's witnesses cannot legally be heard 12 years after the will's confection, to dispute their own solemn attestation to the contrary, evidenced by their subscription under oath in the notarial act of October 7, 1955.
*540 While we subscribe to this plausible principle as first enunciated in Succession of Beattie, 163 La. 831, 112 So. 802 (1926) and repeated in Talton v. Todd, 233 La. 146, 96 So.2d 327 (1957)[6] we do not feel that our present holding is contrary, for two reasons.
First, both Beattie and Talton held that testimony impeaching the earlier solemn statement in the act was not itself sufficient to overcome the presumption of validity if not "corroborated by independent facts or reasonable inferences." In this case we agree, and have agreed, with the Court of Appeal, that the independent inference is supplied by use of the word "revenue" rather than "residue" where the latter rather than the former word was obviously and logically intended (and in fact used by both testator and notary, according to the testimony of one of the witnesses). The logical inference, of course, was that the legally untrained secretary rather than the attorney-notary had typed the inappropriate word "revenue" and presumably therefore the entire will. (For a more elaborate discussion on this point see Court of Appeal discussion commencing at page 202, Vol. 270 So.2d) Finding that this independent inference permits us to entertain the witnesses' testimony, the essential inquiry (as to who in fact typed the will) is easily answered, by the uncontradicted testimony of Mr. Obier's secretary and one of the witnesses, that the secretary had typed the will. (Incidentally, while the third witness to the will, Mr. Desobry, said that he couldn't remember who did the typing he was under the "impression" that Mr. Obier did not type it.)
A second distinction between this case and Beattie and Talton which we consider worth noting is that the testimony here was not nearly so contrary to the earlier attestation. In Talton the contradictory testimony had to do with whether the witnesses were present and whether the will was read. In Beattie the contradictory testimony had to do with whether the witnesses were present, whether the testator dictated her will, and whether the witnesses heard the dictation.
In the case before the Court, we are not dealing with a situation of whether the witnesses were present, whether they heard the dictation or whether the witnesses actually signed the will.
The contradiction with which we are here confronted is that the witnesses subscribed to an attestation clause which stated that the will was written by the Notary, whereas at trial 12 years later they have testified under oath that the Notary's secretary typed the will as dictated by the Notary (after the testatrix had first dictated the content of the will to the Notary). This inconsistency is not nearly so contradictory as was the proffered testimony in Beattie and Talton. The witnesses' explanation that "written by the notary" here was done by the notary's dictating to his typist-secretary is in fact comparable in some degree to the trial judge's good faith but faulty initial interpretation that the words "written by the notary" in C.C. Art. 1578 would permit dictation by the Notary to his typist-secretary.
We do not feel that the witnesses here necessarily impeached their earlier attestation. Since there was however, independent corroboration in the will itself, that the will was not typed by Mr. Obier, we need not rely upon the foregoing distinction, for our opinion here is not contrary to the holdings in Beattie and Talton.
*541 Having determined that Mrs. Killingsworth's will is invalid because not confected in accordance with law, we now turn our attention to the remaining issues before us.
The first of these issues is whether or not a notary is liable to legatees under a will which is invalid as a result of his failure to use proper care in the confection. The Court of Appeal held the notary liable under Louisiana Civil Code Article 2315 after it rejected liability founded upon a breach of a stipulation pour autrui as that doctrine was enunciated in Woodfork v. Sanders, 248 So.2d 419 (La.App. 4th Cir. 1971). We agree that the legatees may recover under article 2315 but find error in the rejection of liability founded upon a breach of a stipulation pour autrui.
The Court of Appeal explained its rejection of the Woodfork stipulation pour autrui as follows:
"With due respect to our brothers of the 4th Circuit, who in Woodfork v. Sanders, supra, held that a stipulation engaging the attorney to confect a will to institute third parties legatees is a stipulation pour autrui (C.C. Art. 1890), we prefer to hinge our decision of C.C. Art. 2315.

"First, we are not convinced that such a stipulation is a true stipulation pour autrui. See Prof. J. Denson Smith's article at 11 T.L.R. 18. Second, C.C. Arts. 1890 and 1902 imply the assent of the beneficiary and once such assent is given the stipulation cannot be revoked without the beneficiary's consent. Certainly, the beneficiary is not a true party to such a stipulation until he does assent to the agreement. Third, a legatee cannot by law accept until the will becomes effective which is upon the death of the Testator. Fourth, a testator may revoke, change or alter his will at any time." (Emphasis supplied)
The first objection goes to the very nature of a stipulation pour autrui. The Court of Appeal was unconvinced that the stipulation between the notary and the testatrix was a true stipulation pour autrui, citing Professor Smith's article in the Tulane Law Review.[7]
We find in this article the following explanation of the classical stipulation pour autrui.
"By the Romans the word `stipulate' was used in opposition to the word `promise'. The creditor stipulated and the debtor promised, to stipulate was to provoke a promise. Therefore, to stipulate for another was to provoke a promise for another." Smith, supra at 18.
Mrs. Killingsworth provoked a promise from Mr. Obier to confect a will which was to name Mrs. Tuttle et al legatees. Mr. Obier entered into an agreement by which he undertook to do something which would benefit the legatees. The legatees were benefited by the agreement between testatrix and notary[8] and such benefit *542 had to be intended by the testatrix and had to be known, if not also intended, by the notary. The failure of the notary to use reasonable care was a breach of the stipulation in favor of the legatees which has caused them damage giving rise to a cause of action founded upon that breach. We adopt with approval the following language from Woodfork, supra, as it is applicable to this case.
"Defendant's second ground of exception, lack of attorney-client privity between himself and plaintiff, is likewise rejected. The testator sought defendant's professional legal assistance in order to benefit plaintiff, the intended universal legatee. We believe the stipulation that a lawyer is to confect a will to institute third parties legatees is a stipulation pour autrui, C.C. Art. 1890, for damages breach of which the third party may sue. See the analogous contract case of Andrepont v. Acadia Drilling Co., 255 La. 347, 341 So.2d 347 (1969). On other grounds it has been held in Weintz v. Kramer, 44 La.Ann. 35, 10 So. 416 (1892), that a notary is liable to intended legatees deprived of their legacy by the notary's clear error. We are satisfied that an attorney's clear error in confecting a will, which the exercise of a reasonable competence would have avoided, constitutes a breach of the contractual stipulation for the benefit of the intended legatee." 248 So.2d at 425. (Emphasis supplied)
The second objection appears to be that the beneficiaries have not assented to the stipulation in their favor. Thus they are not true parties to the stipulation. Assent has nothing to do with the beneficiary's being a party to the contract.
"In the first place, the true third party beneficiary is never a party to the contract. He is never a promisee. The promisee is the stipulator and the promise runs to him and is merely in favor of the third party. It was this very fact that made the progress of the rule so slow among the Romans and that has stood in the way of the development of the doctrine, even to our day, in England. But the French and Louisiana Codes set at rest any notion that a third party could not recover on a contract merely because he was not a party." Smith, supra, page 33.
Assent of the beneficiary is only of consequence (the means of making his advantage indefeasible) where revocation of the contract (by promisee and promisor) is attempted. C.C. Arts. 1890 and 1902. No such revocation, of the promisor's commitment, to confect a valid will, is involved here.
"It seems settled, however, that the right of any beneficiary arises immediately upon the making of the contract although it is subject to revocation until acceptance. In fact the text of the Code does not require an `acceptance'; it requires only `consent' by the beneficiary `to avail himself of the advantage.' In short, the right to the advantage is already his, it has already been acquired, and his `consent' alone is necessary to render it indefeasible. Furthermore, no particular kind of `acceptance' is necessary. Thus, the required consent may be found in any action by the beneficiary which manifests his recognition of the advantage or interest provided for him such as . . . by instituting suit. . ." Smith, supra at 55.
Justice Summers, speaking for the Court in Andrepont v. Acadia Drilling Co., 255 La. 347, 231 So.2d 347 (1969) said:
"Equally without merit is the argument that the third party beneficiary cannot avail himself of the stipulation in his favor for he has not consented to or accepted the stipulation. A categorical answer to this contention is found in a recent decision of this Court. Mr. Justice LeBlanc, speaking for the Court in *543 First State Bank v. Burton, 225 La. 537, 549, 73 So.2d 453, 457 (1954), said:
"`The law does not provide for an express acceptance of or consent to a stipulation pour autrui by the beneficiary nor does it prescribe any particular form of acceptance or consent. In some cases it was held that the appearance of the beneficiary as claimant in a suit before the Court is evidence of acceptance and certainly it would seem, under that jurisprudence that the claim now being asserted by Morris & Kendrick in this proceeding, regardless of any proof of their assent, is sufficient. See Muntz v. Algiers & Gretna Ry. Co., 114 La. 437, 38 So. 410; Vinet v. Bres, 48 La.Ann. 1254, 20 So. 693. See also Twichel v. Andry, 6 Rob. 407 (La.1844); Smith, Third Party Beneficiaries in Louisiana; The Stipulation Pour Autrui, 11 Tul.L.Rev. 18, 55 (1936).'"
The third objection was that by law the legatees cannot accept the legacies until the will becomes effective on the death of the testatrix. The promise provoked by the testatrix for the benefit of the legatee was not that the attorney-notary deliver legacies, but only that he exercise reasonable care to confect a will naming them legatees. Further, there is no time limitation in which the beneficiary must accept the stipulation in his favor. Rather the stipulation pour autrui subsists until the time of assent, provided it has not been lawfully revoked prior to the time of assent. See Smith, supra, at 55.
The fourth objection was that the testatrix could have changed her will at any time. This doesn't affect the duty of the notary to have confected a proper will, although had the testatrix changed her will it may have lessened the consequences of his negligence.
Thus we find that the aggrieved legatees may recover from the attorney-notary who has confected an invalid will, as contract beneficiaries under a stipulation pour autrui.
While finding a stipulation pour autrui in the agreement to confect a will, we have not found in this case, nor would we ordinarily expect to find, a warranty by the attorney-notary to execute a valid will, but only an implied promise to exercise reasonable care in the performance of his work.
Furthermore, we believe, as did the Court of Appeal in this case, that C.C.Art. 2315 provides a basis for recovery as well. A notary public is a public officer, owing to all men a duty to use reasonable care in the confection of his public acts. LSA-R. S. 35:2 (1950); Levy v. Western Cas. & Sur. Co., 43 So.2d 291 (La.App. 1950). The test is stated in 58 Am.Jur.2d Notaries Public, Sec. 23, as follows:
"In order to recover for the act or default of a notary in the performance of his duties as such the burden is upon the plaintiff to show first that the notary did not faithfully perform the duties of his office, and, secondly, that the plaintiff was injured and damaged as a result of such failure, and that such failure was the proximate cause of the loss and injury which he sustained." 58 Am.Jur. 2d at 469.
We find that the required showing has been made in this case. In the confection of a nuncupative will by public act, the notary is well aware that the benefit bestowed on the legatees by that act is contingent upon the observance of the prescribed formalities. The consequences of his failure to observe these formalities is foreseeable. Where, as a result of his negligent failure to use reasonable care to comply with these formalities, the bequest is rendered invalid, the notary may be held liable in damages to the injured legatee in tort.
The Obier heirs, Middleton & St. Paul next argue, (in the alternative since their principle contention was that the will is valid) that the Court of Appeal erred in permitting the use of the testament which it had declared null, to establish the identity *544 of the legatees and the nature of their respective legacies. They say that the legatees bear the burden of establishing not only that the invalidity of the testament was occasioned by negligence on the part of the notary, but also who were the intended legatees and what were the intended legacies. It is argued that there is not a word of testimony to establish either of these facts. The witnesses to the will had no independent recollection which would establish the identity of the legatees or the nature of the property it was intended they should receive. They say that the Court of Appeal relied simply on the recitals of, and the testament itself. If the will is null for one purpose it should be null for all purposes, it is argued.
While the argument is interesting, it is less than persuasive. The document purporting to be the last will and testament of Mrs. Killingsworth has been determined to be invalid as a will because of noncompliance with a statutory requirement in its confection. Nonetheless, it is the strongest possible proof of Mrs. Killingsworth's desire and intention with respect to the disposition of her estate. It is probably a good notarial act (since executed before a Notary Public and at least 2 witnesses and because a simple notarial act may be typed by a person other than the Notary Public) although it does not suffice as a nuncupative will by public act. It is at least an admissible solemn instrument signed by the deceased expressing her desires relative to disposition of her estate. It is indeed better evidence than, say, hearsay testimony as to decedent's oral expressions relative to intended bequests made prior to death.
Furthermore, to bar use of the invalid will to prove its content would in virtually all instances effectively preclude holding the negligent attorney for the loss to legatees occasioned by such negligence. See Weintz v. Kramer, 44 La.Ann. 35, 10 So. 416 (1892) and Woodfork v. Sanders, 248 So.2d 419 (La.App. 4th Cir. 1971). While these cases are not authority for the precise evidence question here at issue, they are cases implying that the invalid will ought to be admissible to prove its uncontroverted contents.
Then let the legatees be bound by all of the will's provisions, including that they were meant to receive only the "revenue" and not the bulk of the decedent's estate, argue appellants. While this argument is a bit more difficult to counter than the earlier effort to bar the will entirely, to legatees' prejudice, we find that it too has no merit.
Logic dictates that "residue" was intended since it appears at the end of the will where the universal legacy would normally be found; decedent left no surviving spouse to whom a usufruct (assuming that "revenue" was intended to mean usufruct) might logically be intended; decedent made no disposition of the corpus of her estate and surely would be expected to have done so if she had intended in the controverted clause to have disposed of only the revenue of her estate; the legally untrained and inexperienced secretary (she was then 19 years old, this was her first job and she had been employed by Obier & Middleton only 16 months) could easily have misconstrued residue for revenue, two words phonetically similar; and one of the witnesses testified that he distinctly recalled that both the decedent and the notary used the word "residue", rather than "revenue."
Furthermore, regarding the balance of the will, there has been no showing that in its confection there were any other mistakes as to its content. Under these circumstances we believe the Court of Appeal was correct in finding that Mrs. Tuttle, et al. were the intended legatees and that the residue, or bulk of the estate was intended by Mrs. Killingsworth for them.
The Obier heirs, Middleton and St. Paul, further argue that there has been no showing of negligence on the part of Mr. Obier, that there was no proof of the standard of care required of an attorney in drafting a will nor evidence of the general standard *545 of care exercised by members of the legal profession in the area of the State in which Mr. Obier practiced. And, of course, reasonable care is the maximum duty owed as we have earlier determined, whether impliedly agreed, upon entering the contract to confect the will or under Art. 2315.
Whether there exists a single statewide standard of care for practicing attorneys or community by community standards we are satisfied that an attorney-notary who prepares a nuncupative will by public act by permitting his secretary to type the will is negligent. As was stated in Weintz v. Kramer, supra: "5. A Notary undertakes the confection of a testament by public act with full knowledge that its validity depends on the most exact fulfillment of the formalities required by law. * * * If he chooses to deviate from the law, and to substitute language of his own choice to convey the same meaning, he does so at his own risk, and cannot throw resulting loss on innocent persons."
The Obier heirs filed a plea of one year prescription under Article 3536 of the Civil Code. It was rejected in both the District Court and the Court of Appeal and is reurged here. Counsel for exceptors direct our attention to 7 Am.Jur.2d 154, § 186 for the general proposition that a client's cause of action based on professional negligence or misconduct accrues at the time of the negligence or misconduct and the statute of limitation begins to run at that time. They also cite Goldberg v. Bosworth, 29 Misc.2d 1057, 215 N.Y.S.2d 849 (N.Y.S.Ct. 1961). The Court of Appeal held that prescription in a case of this nature does not commence to run until there is a final judgment decreeing the will to be invalid. We agree that the plea of prescription was properly overruled.
While we would be inclined to hold that prescription did not commence to run against the legatees any sooner than the date of Mrs. Killingsworth's death (in which event not even the one year tort prescription would lie under the facts here) we need not so hold since the prescription plea urged (one year) is not applicable to a contractual claim of the third party beneficiary (The applicable prescription on a claim under contract is 10 years). C.C.Art. 3544. Federal Insurance Co. v. Insurance Co. of North America, 262 La. 509, 263 So.2d 871 (1972).
Middleton and St. Paul argue that the Court of Appeal erred in holding the law partner of an officiating Notary vicariously liable for acts committed by the Notary in confecting a nuncupative will by public act. They argue that the record does not indicate whether Mr. Middleton was a notary nor that there was any partnership except that of a law partnership, nor that Mr. Obier had been consulted by Mrs. Killingsworth as an attorney in connection with the preparation and confection of the will. The record shows that Mr. Obier was Mrs. Killingsworth's attorney and that she visited him at his office on legal business, frequently. We hold as did the Court of Appeal that confection of Mrs. Killingsworth's will was law partnership business.[9]
St. Paul takes the position that the professional liability policy issued by them affords coverage for Middleton but does not afford coverage for Mr. Obier or his heirs.
*546 The pertinent facts in connection with this contention are as follows:
1. St. Paul issued a lawyers professional liability policy with the named insured being the partnership of Obier and Middleton and W. B. Middleton, Jr. and W. P. Obier.
2. The effective date of the policy was February 5, 1960.
3. The policy period was from February 5, 1960 through February 5, 1963.
4. There was an endorsement to the policy including the "insured's" capacity as Notary Public.
5. The invalid will was executed before Mr. Obier on October 7, 1955.
6. Mr. Obier died on May 10, 1961.
7. Mrs. Killingsworth died on July 19, 1961.
8. The full three year premium had been paid by the insureds.
9. After Mr. Obier's death in May 1961 and before Mrs. Killingsworth's death and subsequent discovery of Mr. Obier's negligence, St. Paul issued an endorsement naming a new firm as insured, Middleton & Templet and deleting Mr. Obier, from the policy.
10. There was no refund of premium to anyone incident to the deletion of Mr. Obier from the policy.
11. No one informed Mrs. Obier or the heirs of Mr. Obier that Mr. Obier's name had been deleted from the policy by endorsement.
St. Paul acknowledges that under the provisions of the policy there is coverage for negligence of an insured committed before the effective date of an initial policy provided that the claim is made or suit is brought during the existence of the policy or any renewal thereof. (In this case there was only one policy and one policy period.) They further contend, however, that coverage for negligent acts occurring prior to the effective date of the policy is not afforded if such claim is discovered or asserted for the first time after the termination of policy coverage. They contend that upon Mr. Obier's death policy coverage as to him necessarily terminated, and since his negligence committed in 1955 was not discovered, nor claim asserted until after his death that his negligent act in the year 1955 was therefore not covered.
While their construction of the policy provisions as to prior negligence discovered after policy termination may be correct in the situation where an attorney has voluntarily discontinued coverage, or perhaps even for a deceased attorney following expiration of his last policy period it is clear that construction does not prevail in this instance, where the prior negligent act was discovered during the policy period.
Article IV of the policy (Insuring Agreements) provides, "This policy applies within the United States of America, its territories or possessions or Canada to professional services performed for others(a) during the policy period (b) prior to the effective date of the policy if claim is made or suit is brought during the policy period and providing the Insured had no knowledge or could not have reasonably foreseen any circumstance which might result in a claim or suit at the effective date of the policy."
The only definition of "policy period" appears in Item 3 of the policy and reads as follows: "Policy Period: From February 5th, 1960 to February 5th, 1963, 12:01 Standard Time at the address of the named insured as stated herein."
Since policies of insurance are to be interpreted reasonably in favor of the insured and since there is really no ambiguity anyway relative to what constitutes the policy period according to the terms of the policy, we find no merit in St. Paul's contention. The claim was clearly made and *547 suit brought in the Fall of 1961, within the 2/5/60-2/5/63 policy period.
Nor do we find any comfort to St. Paul in Section 8 of the policy which they have directed to our attention. It provides as follows: "8. Assignment. The interest of the Insured under this policy shall not be assignable to any other person. In the event of the death or incompetency of the Insured, this policy shall cover the insured's legal representative as an insured as respects any liability previously incurred and covered by this policy." (Emphasis supplied)
For the foregoing reasons we find that the policy issued by St. Paul affords coverage for the Obier's heirs.[10]
The next alternative assertion by the Obier heirs, Middleton and St. Paul is their specification of error that the Court of Appeal erred in rejecting their third party demands filed against the legal heirs.
On the matter of the third party demand the Court of Appeal said:
"St. Paul, Mr. Middleton, and the heirs of Mr. Obier seek third-party relief against the legal heirs of Mrs. Killingsworth on the grounds of unjust enrichment. It is claimed that the legal heirs have been unjustly enriched by the error of Mr. Obier and that but for this error they would not have received their respective portions of the decedent's estate. We have examined the authorities cited and find the facts therein inapposite to those in the case at bar. In Smith v. Town of Vinton, 216 La. 9, 43 So.2d 18 (1949) and Boxwell et al. v. Department of Highways, 203 La. 760, 14 So.2d 627 (1943), the recipient receives certain advantages resulting from an illegal contract which was entered into in good faith by plaintiff. Such is not the case here. The legal heirs were not parties to the confection of the will and their rights flow from the laws of this state relative to the distribution of an intestate succession. On the other hand, the liability of the heirs of Mr. Obier and Mr. Middleton flow from the act of Mr. Obier in not typing the will himself, wherein he failed to exercise the degree of care and diligence required of a Notary. St. Paul, the insurer, stands in the same position as that of the insured. To permit recovery in their favor would, in effect, validate the error complained of, and permit the insurer to completely escape liability for the very act it insured. Generally, the doctrine of unjust enrichment is inapplicable where the recipient is receiving what the law allows and is thus not unjustly enriched."
We find no error in this determination of the Court of Appeal. The cited cases, Smith and Boxwell are inapposite. The rights of the legal heirs here flow from the laws of the State relative to distribution of an intestate's succession, as aptly stated by the Court of Appeal, and not from any improper enrichment or illegal contract as in Smith and Boxwell.
Counsel for St. Paul takes issue with the language of the Court of Appeal which might be read to imply that the existence of insurance coverage makes a difference in determining the availability of the asserted third party claim (based on unjust enrichment). Counsel, of course, is correct in that the insurance company stands before the Court just as any other litigant and should have the merit of their claim here passed upon as though it were being urged by the insured alone. We have given the claim that consideration. It has no merit.
The final error urged by the Obier heirs, Middleton and St. Paul has merit.
The trial court held that the extent of the loss of the legatees should be the difference between what they will inherit as heirs and what they would have received as legatees.[11] In computing the amounts *548 that each legatee would have received, the trial judge used the gross value of the estate as of August 24, 1961 ($95,765.27) and deducted therefrom certain debts and taxes ($5,995.59), estimated fees of the executor and the executor's attorney ($6,000) and particular legacies ($4,500). Thereupon he fixed the legatee losses as the difference between this net figure, $79,269.68, and $33,663.63, the amount he calculated would likely be the legatees' legal inheritances. He therefore allowed $45,606.05 as the loss to the legatees, and cast the Obier heirs, Middleton and St. Paul in this total sum.[12]
The Court of Appeal noted that the District Judge erred by not taking into account additional estate revenues and stock dividends amounting to $19,081.95, this being contained in a stipulation of November 15, 1967. The court thereupon set aside the judgment pending reconsideration and remanded the case to the District Court directing that the court in determining the losses to the legatees give consideration to the $19,081.95 stipulated additional revenues as of November 15, 1967 and to ascertain upon conclusion of the administration the amount of the respective inheritances and/or damages so that defendants can be properly cast in judgment.
It should also be noted that the judgment of the trial court had directed that the defendant pay legal interest at the rate of 5% per annum from date of judicial demand on the sums which the trial court awarded. Appellants contend that several mistakes were committed. They allege that the status of the lower court judgments if unchanged would require them to pay to the legatees sums based on an administered estate with accumulating revenues while at the same time paying legal interest from date of judicial demand (demand was in 1961, shortly after the death of Mrs. Killingsworth). They further allege that the trial judge has not been instructed in the order of remand by the Court of Appeal to take into account debts of the succession following the date of stipulation, November 15, 1967. They further allege that neither the District Court nor the Court of Appeal has allowed in computation of the legatee losses a deduction for the amount of inheritance taxes which the legatees would have had to pay in the event they had received their legacies under the will.
Then they argue that the measure of damages ought to be based upon at most the net succession inventory as of August 24, 1961 plus 5% legal interest from date of judicial demand.
While we do not agree that the Court of Appeal remand order directs the trial court to disregard succession debts after November 15, 1967, and while the damages should not be ascertained based upon the August 24, 1961 net inventory and legal interest, we do agree that in computing the legatee losses there should not be included both legal interest from date of judicial demand and at the same time, from an administered succession revenues which are necessarily included in inheritances ascertained after administration, and we do agree that in calculating the loss of the legatees there should be a reduction equal to any inheritance taxes which would otherwise have been paid by the legatees had they inherited under the will. Legal interest, if any, should be allowed only from the date on which the trial court, upon remand, fixes the damages due the legatees.
Accordingly, for the above and foregoing reasons the judgment of the Court of Appeal is affirmed in part, reversed in part and the case is remanded to the District Court for further proceedings in accordance with the views herein expressed.
Affirmed in part, reversed in part and remanded.
*549 BARHAM, J., dissents with reasons.
BARHAM, Justice (dissenting).
I am of the opinion the majority errs in two respects. First, I am of the opinion that if the will were confected in the manner described in the undisputed testimony of the witnesses, it is valid. Second, I am of the opinion parole testimony could not be resorted to in the instant case to contradict the positive written declarations under oath of these witnesses.
As to the first issue, we are called upon to interpret Civil Code Article 1578 in order to determine the validity of this will. That article provides:
"The noncupative testaments by public act must be received by a notary public, in presence of three witnesses residing in the place where the will is executed, or of five witnesses not residing in the place.
"This testament must be dictated by the testator, and written by the notary as it is dictated.
"It must then be read to the testator in presence of the witnesses.
"Express mention is made of the whole, observing that all those formalities must be fulfilled at one time, without interruption, and without turning aside to other acts."
The attestation clause or affidavit which follows the testament affirmatively declares that all of these acts required by law were complied with, however, the testimony of the witnesses who signed the affidavit under oath before the notary attempts to vary the content of the affidavit as to the act of the notary writing the will from the dictation of the testator. The testimony of the three witnesses may be summarized as follows:
The witnesses were present and seated in the office of Mr. Obier with the door closed;
Mrs. Killingsworth, the testatrix, was seated across the desk from Mr. Obier;
Mr. Obier sat behind his desk and his secretary, Miss Melancon, sat on his immediate right at the desk, with a typewriter in front of her on the desk;
Mrs. Killingsworth would dictate "or tell" Mr. Obier the particular bequests she wished to make; he would receive her dication or her oral statement of bequests and would in turn restate the bequest slowly enough for his secretary, Miss Melancon, to type the will as Mrs. Killingsworth and Mr. Obier spoke.
It is undisputed that Mr. Obier received the testamentary dispositions from Mrs. Killingsworth. It is undisputed that he in turn had them reduced to writing on the typewriter by slowly restating what he had received from Mrs. Killingsworth so that Miss Melancon could type the testament in one whole piece without turning aside or departing at any time from the closed room.
The question then posed is, was this testament "written by the notary as it is (was) dictated?"
"Written" in Article 1578 has an entirely different meaning from "written" as contained in Article 1588, which details the requirements of an olographic testament. See Prudhomme v. Savant, 150 La. 256, 90 So. 640 (1922). In that case, the dissent by Justice O'Neill and the majority opinion by Justice Baker on rehearing recognize that an ex tunc resolution of the meaning of "written" would have to be resolved so that a notary to a noncupative testament there considered in 1921 would have had to write the testament with his own hand. Both recognize that the drafters of the Code did not know about typewriters nor did they contemplate the invention of such a machine that "would not show the characteristic handwriting of the writer", but both pose the question as to whether the writers of the Code intended to forbid the use of typewriters for the purpose of writing a noncupative will by public act.
*550 Their rationale was that if the framers of the Code did not anticipate or contemplate the invention of typewriters, it is certain they did not intend to forbid the use of them for writing. It is true that Justice O'Neill distinguishes Prudhomme from Knight v. Smith, 3 Mart.O.S. 156 (1813) but even in distinguishing, I do not read in his dissent his wholehearted adoption of the holding in that case. First, he notes that the case was then 108 years old (it is now 160 years old). He further notes that it was a strict application of the "letter of the law" in Knight v. Smith, which required the notary himself to write the will, not permitting his clerk to do so.
The Codal provision which we examine has been in the Code continuously since its inception in 1808[*].
In adhering to the Codal requirement of Article 13: "When a law is clear and free from all ambiguity, the letter of it is not to be disregarded, under the pretext of pursuing its spirit", it is only logical that language of law in one era may be clear but the conciseness and clarity can be eroded away a century and a half later, in a society far more sophisticated and complex. The letter of the law to be applied here is simply "written by a notary". As was in the Prudhomme case, if you examine this law subjectively, looking only to the intent of the legislature at the time of its becoming law, only one conclusion can be drawn and that would be that the will had to be handwritten by a notary. This was the only method possibly contemplated by the drafters of the Code. However, more modern practice forced the court in Prudhomme to disregard the clear and concise meaning of "written by the testator" in light of the custom and practice of writing with a machine. Acknowledging the intent of the enactors of the legislation, but under the ex nunc approach for determining meaning at the time they examined the statute, they were forced to extend the language in light of practice and custom not used or developed at the time of its enactment.
While our Code refers to a notary public, we of the court would be blind to reality if we did not acknowledge that a noncupative will by public act is almost invariably confected by or under the guidance of an attorney, whether he himself is the notary, or someone in his office has a notarial commission. Even the majority here recognize that this was a lawyer-client relationship and not a simple notarial engagement when they award damages against the law partnership. In the attestation clause the attorney states what he thought he had accomplished by drafting the will in the manner which he did. This is Mr. Obier's statement in the attestation clause:
"This last will and testament of Mrs. Freddie Robertson Killingsworth was dictated by her to me, Notary, in the presence and hearing of the aforesaid witnesses, and the same was reduced to writing by me, Notary, and dictated by said testatrix * * * The whole of this will was received, dictated, written, read and signed by me, Notary, the said testatrix and the undersigned witnesses at one time, without interruption and without turning aside to any other acts whatsoever."
Unquestionably, the attorney knew that a writing by the notary was necessary. Unquestionably, the attorney believed he had accomplished the writing by a notary as required by the Code when he acted as he did here. Unquestionably, he received the will and it was dictated to him. The attorney-notary simply did not press the keys of the typewriter himself. He instead had a secretary immediately beside him push the keys of the typewriter to make the written word which he directed her to place on the paper. Ordinarily, the secretary, who worked for two lawyers, would have used *551 a typewriter at her desk in her office. The lawyer placed her beside him to make the writing simultaneous with the dictation. This was simply a technical and mechanical function requiring no discretion and no independent exercise of will by the secretary. She was simply a tool for production of the writing. She was totally under the control of the lawyer and was required to punch the keys which he told her to punch. Her fingers reacted to words rather than to individual letters but this is only a matter of degree. Her fingers had no choice to select other words than those directed to be received by her after having been received by the notary.
The common practice, the universal custom in law offices which can afford secretarial help, and few, if any, exist in this day and time which do not have secretarial help, is that all writings in the office prepared for signatures of clients, as pleadings in court or for other uses, are accomplished through direct dictation which the attorney commands the secretary to reduce to writing on a mechanical device. It is even possible, if one would indulge in the expense involved, for an attorney to speak words into a mechanical device, and have the writing of the words simultaneously and immediately produced by another mechanical device. The intermediary, the secretary, who now receives the dictation and produces the writing, may be totally eliminated. A will could be confected thusly. The testator dictates to the notary her bequests which are received by the notary; he in turn instead of using pencil or pen, instead of using typewriter or even as here, instead of using a secretary to punch the typewriter keys for him, merely dictates into a microphone for immediate transcription by a machine into writing the testator's requested testament, ready immediately as an exact duplication of the dictation.
Surely the adopters of the 1808 Code had not the remotest conception that such technical advances would occur and that great benefits could result therefrom which would make the confection of the noncupative will by public act more accurate, more certain in terms and more protected from any possibility of fraud or error. It is not possible that the drafters of the Code meant to forbid these new methods for producing writings. The Code was not designed to straight-jacket the people into precise finite strictures of law, rather it was designed to live for centuries.
It is the judiciary's obligation to make the Code serve the needs of the people as it was intended when the Code was drafted. This does not mean that we look to their knowledge and intent at the time of drafting. It means that we should understand the problem they attempted to solve by their legislative enactment and within the context of the solution they proposed we should find the applicability of that general solution through particular means in our new, changing and complex society. We have said so repeatedly that it becomes trite to restate, that the intention of the testator should be given effect when possible. This is an overriding consideration when we began to examine the Code articles relating to forms of testaments. The majority admits here that although the testament falls as such because of a technicality, it is still good as the best evidence as a private writing or notarial act so as to determine who the testator meant to give his property to. That is the very question we begin with and end with when we examine a will. We examine it in order that we might determine the testator's desires as to the distribution of his property upon his decease. He can no longer speak and we must look at a cold writing to verify his intentions. Here we have a writing, a writing which I believe to be within the letter of law, sufficient to establish the validity of his noncupative will by public act, a writing by the notary who simply used the fingers belonging to another for the mechanical function of pushing the keys on a typewriter.
It is a writing not forbidden by the Code, it is a writing wholly within the intendment *552 and language of the Code article in light of custom and practice today. Moreover, this construction permits the Article to live and breathe in the context of future societies for centuries to come. The majority indicates that such strict formality is required for the noncupative will by public act, that a notary or lawyer should approach the confection of it with trepidation, aware that he must be unduly careful in the confection of such a difficult instrument.
What kind of law is this? Why should we believe the redactors of our Code wished to make it difficult to make testaments? Why should we believe that they wished technical formalities to defeat the intent of the deceased as to disposition of his property? It cannot be that we should impute such narrow, mean philosophical conceptions to men who had foresight enough to build a Code which has lasted for the most part intact, for 165 years. It is the obligation of this court to keep that Code alive and to make it serve the people. The construction I placed on the Code article for determining the validity of this will is not strained. To the contrary, it is the natural consequence of looking for living legislative intent. Moreover, it is a construction which would be wholly acceptable to the public. It is a construction that gives life to custom and practice in our highly advanced society. Further, it is a construction which in no wise deteriorates the self-proving qualities of the noncupative will by public act. It in no way opens the door to fraud or ill practice in the confection of such an instrument. To the contrary, the majority's holding is that this written instrument with solemn oath and attestation is really not binding on those who gave that oath.
Undoubtedly, the testator and her attorney believed they had confected a will in compliance with law which would carry out the intention of the testator upon her decease. I am of the opinion that they were both correct in relying upon the instrument as a valid testament. The testament was written by the notary as required by Civil Code Article 1578.
On the second point, undoubtedly this case is on all fours with the holdings in Succession of Beattie, 163 La. 831, 112 So. 802 (1926), and Talton v. Todd, 233 La. 146, 96 So.2d 327 (1957). There are no corroborating independent facts or reasonable references to corroborate the testimony of the witnesses. The majority strains to find what they believe to be an incorrect spelling of a word in the will for a corroborative fact. First, there is no reason that they should change the word "revenue" to "residue". The testatrix was perfectly capable of leaving her revenue and reserving the perfect ownership for her natural heirs. There is no independent believable testimony that we should change these words in the will, and even if we were to concede "residue" was intended, why does this court believe that a lawyer would not make a spelling mistake as readily as would his secretary? There is testimony that he read this will back to the testatrix and the witnesses. He had every opportunity to correct the word "revenue". It must be assumed either the word "revenue" was intended, or that the lawyer made the same mistake he could have made had he written the will when he read it.
The holding of the majority is contrary to Beattie and Talton. The rule stated in those cases is a very valid rule which we should retain intact.
I respectfully dissent for both reasons stated.

ON REHEARING
MARCUS, Justice.
We granted a rehearing in this matter to reconsider the validity of the last will and testament of Mrs. Freddie Robertson Killingsworth.
The posture of these consolidated cases, as well as the parties thereto, are set forth in our original opinion and need not be reiterated *553 except insofar as they are pertinent to our present reconsideration.
Mr. W. P. Obier, Sr., now deceased, was the attorney and Notary Public who assisted Mrs. Killingsworth in the drafting of her will on October 7, 1955. The will is in the form of a nuncupative will by public act. Article 1578 of the Civil Code provides the formalities for the validity of such a testament. Article 1578 reads:
"The nuncupative testaments by public act must be received by a notary public, in presence of three witnesses residing in the place where the will is executed, or of five witnesses not residing in the place.
"This testament must be dictated by the testator, and written by the notary as it is dictated.
"It must then be read to the testator in presence of the witnesses.
"Express mention is made of the whole, observing that all those formalities must be fulfilled at one time, without interruption, and without turning aside to other acts."
There is no question, nor is it contended to the contrary, that, on its face, Mrs. Killingsworth's will meets all the formalities for validity prescribed by Article 1578 of the Civil Code.
Upon being informed that certain of Mrs. Killingsworth's legal heirs[1] were going to contest the validity of the will, the legatees under the will[2] filed suit to have the testament declared valid. During the course of the litigation that followed, the matter was ultimately remanded to the trial court for trial on the merits. At this hearing, the trial court admitted evidence, over objection, concerning the confection of the will.
The sole evidence adduced regarding the validity of the will was the testimony of the three subscribing witnesses. First to testify was Mrs. Lorraine M. Passantino, formerly Miss Lorraine Melancon. She was Mr. Obier's secretary at the time the will was confected. She testified that Mrs. Killingsworth discussed what was to be included in the will with Mr. Obier, then Mr. Obier dictated the provisions of the will to her which she typed on a typewriter as he dictated them to her. Mrs. Edna Lapeze, another subscribing witness, corroborated the testimony of Mrs. Passantino. The third subscribing witness, Mr. R. G. Desobry, could not remember who typed the will; however, he was under the "impression" that Mr. Obier did not do it.
The legal heirs of Mrs. Killingsworth not named legatees under the will argue that the testament is invalid since it was not "dictated by the testator, and written by the notary as it is dictated" in conformity with Article 1578. In support of this contention, these parties point to the testimony of the subscribing witnesses to the will and, in addition, certain word usage in the will itself.
It is well settled that recitals of a nuncupative will by authentic act must be considered as proved until disproved. Succession of Block, 131 La. 101, 59 So. 29 (1912); Renfrow v. McCain, 185 La. 135, 168 So. 753 (1936). This creates a strong presumption in favor of the validity of a nuncupative will by public act where, on its face, all the formalities required by law have been complied with. However, this is not a conclusive presumption, but, rather, a rebuttable one.
Thus, the next question presented for our resolution concerns the sufficiency of the evidence necessary to overcome the *554 presumption of validity of a nuncupative will by a public act.
In Succession of Beattie, 163 La. 831, 112 So. 802 (1927) and Talton v. Todd, 233 La. 146, 96 So.2d 327 (1957), we established the requirements necessary to overcome the presumption of validity where the testimony of subscribing witnesses is contrary to the recitals in the testament. In Beattie, as subsequently quoted in Talton, we held:
"Testimony of subscribing witnesses which is adduced on the contest of the will and which, in effect, impeaches the solemn statements contained in the instrument which by their signatures they have attested as correct, is not in itself sufficient to overcome the presumption of validity arising from their presence and signatures and the official certificate of a public officer fortified by his oath. Their testimony must be corroborated by independent facts or reasonable inferences. * * *"
In our original opinion, we concluded that our holding was not contrary to the principle enunciated in Beattie and Talton for two reasons. First, we were of the opinion that the subscribing witnesses did not necessarily impeach their earlier attestation in the will. Secondly, we found that the reasonable inferences required by Beattie and Talton corroborating the negative testimony of the subscribing witnesses was supplied by the word "revenue" in the twelfth clause of the will. We inferred from this word usage that the legally untrained secretary, rather than the attorney-notary, had typed the seemingly inappropriate word, thus, presumably, the entire will.
Upon further consideration, we conclude that we were incorrect in our original findings.
First, it is evident that the subscribing witnesses to the will have attempted some twelve years later to impeach the recitals in the will.
The preamble of the will reads in part as follows:
"* * * the said Mrs. Freddie Robertson Killingsworth, Textatrix, dictated to me, this her last will and testament in the presence of the aforesaid witnesses, and I, said Notary, received the same from her dictation and wrote down the same as dictated to me in the presence of her, the said Textatrix, and the aforesaid witnesses in words and figures as follows, to-wit: * * *"
The attestation clause of the will provides in part:
"This last will and testament of Mrs. Freddie Robertson Killingsworth was dictated by her to me, Notary, in the presence and hearing of the aforesaid witnesses and the same was reduced to writing by me, Notary, and dictated by said Testatrix."
The witnesses, by their presence and the affixing of their signatures to the will, attested to the fact that the will had been dictated by the testatrix and written by the notary as it was dictated, as evidenced by the recitals in the will above quoted. Then, some twelve years later, these same witnesses testified that the attorney-notary did not personally type out the will from the testatrix's dictation, but, rather, that the notary's secretary typed the will from the notary's dictation after conferring with the testatrix. This testimony is clearly contrary to the recitals in the will.
Secondly, we are no longer of the opinion that the use of the word "revenue" in the twelfth clause of the will constitutes a reasonable inference as required by Beattie and Talton to corroborate the negative testimony of the subscribing witnesses. The reasons for reaching this conclusion are hereinafter set forth.
The first five clauses of the testament institute certain named persons as heirs under particular title with a description of the movable property bequeathed to each. The sixth clause directs that all other *555 property possessed by the testatrix at the time of her death be sold by her executor. Thus, the testatrix intended to convert the remainder of her estate into cash. Clauses seven through eleven bequeath certain sums of money to certain named charities and particular people. The twelfth clause provides:
"After paying all debts I direct that the revenue of my estate be divided equally between Rome Schlater Johnson Tuttle, Mary Lewis Johnson Row, Regina Bronner and Winona Johnson Bell, share and share alike, and in case of the death of any of the legatees named in this paragraph their respective shares to go to their heirs."
The remainder of the will contains the appointments of executor and attorney and concludes with the attestation clause.
Conceding that at the position in the testament where the twelfth clause appears, a testator would usually bequeath the remainder of his estate in full ownership, the bequest of only the revenue of the remainder, without disposing the naked ownership thereof, seems unusual. However, reading the will as a whole in order to ascertain the intention of the testatrix, the word usage contained in the twelfth clause loses its unusual character. It is well settled that when a particular provision of the will does not, standing alone, reveal the clear intent of the testator, we must take into consideration the other clauses and the whole language of the will. Article 1712 of the Civil Code; Succession of Montegut, 211 La. 112, 29 So.2d 583 (1947); Succession of Kamlade, 232 La. 275, 94 So.2d 257 (1957); Succession of Barry, 250 La. 435, 196 So.2d 265 (1967).
The will presents a logical and organized disposition of decedent's estate. First, the testatrix bequeathed certain personal property to four of her legal heirs. The nature of the property evidences that the testatrix probably affixed special meaning to these items. They included such things as her diamond engagement ring, cut glass, china, silverware, etc. Just as obvious is that the testatrix favored these legal heirs since she bequeathed to them, rather than to other legal heirs, those personal effects usually having special significance.
After making these particular bequests, the testatrix directed that the remainder of her estate be sold. She then bequeathed certain sums of money to certain charities and particular people. Thereafter, she directed that, after paying all debts, the "revenue" of her estate be divided equally between the same four relatives whom she had instituted as heirs under particular title to special movables earlier in the will.
It is obvious for several reasons that the testatrix intended to leave to the legal heirs named legatees under the will the remainder of her estate after execution of all special bequests. First, the only asset remaining in the estate to be governed by the twelfth clause of the will is cash. In addition, cash derived from the sale of property is often referred to by a layman as revenue. Furthermore, it is illogical to conclude that the testatrix intended to bequeath to obviously favored relatives only the income produced by cash, thereby allowing the naked ownership of the cash to be distributed by the laws of intestacy to non-favored legal heirs, rather than bequeathing the cash itself to the favored relatives. The law does not countenance a presumption that the testator intends to die intestate as to any part of his estate; rather, the law reasonably and naturally presumes that when a will is executed, the testator intends to dispose of his entire estate. Succession of Fertel, 208 La. 614, 23 So.2d 234 (1945); Succession of Montegut, 211 La. 112, 29 So.2d 583 (1947). For these reasons, we conclude that, by the particular use of the word "revenue" in the twelfth clause of her will, the testatrix intended to bequeath the remainder of her estate in full ownership to the persons named therein.
*556 Incidental to this determination, and governed thereby, is the status of such word usage in view of Beattie and Talton. Since the word "revenue" has a logical meaning when read with the entirety of the testatrix's will, we do not find that it constitutes a sufficient independent fact or reasonable inference corroborating the negative testimony of the subscribing witnesses as required by Beattie and Talton. It has been further argued that the use of the word "precede" in the will instead of the word "predecease" constitutes another reasonable inference that the will was typed by someone other than Mr. Obier. We find no merit to this contention. The word usage is clear and unambiguous, and it can be reasonably assumed that the testatrix used same in her dictation of the will to the notary.
Accordingly, we conclude that the negative testimony of the subscribing witnesses is not supported by sufficient independent facts or reasonable inferences. As in Beattie and Talton, the testimony here must give way to the recitals in the will itself an instrument executed in notarial form which states that it was dictated by the testatrix and written by the notary as it was dictated. The recitals in the testament clearly indicate that the formalities required by Article 1578 of the Civil Code have been complied with. Thus, we conclude that the testament is valid.
For the reasons assigned, our original decree is set aside; the judgment of the Court of Appeal affirming the judgment of the district court is reversed; the last will and testament of the late Mrs. Freddie Robertson Killingsworth executed before W. P. Obier, Notary Public, on October 7, 1955 is hereby declared valid; and the case is remanded to the district court for further proceedings in accordance with the views herein expressed.
BARHAM, J., concurs in the result for the reasons assigned in dissent on first hearing.
TATE, J., concurs and assigns written reasons.
DIXON, J., dissents.
CALOGERO, J., dissents with reasons.
TATE, Justice (concurring).
With reservations, I eventually concur.
Our original majority opinion correctly held the will invalid in each the court of appeal and the trial court under the then existing jurisprudence.
Under this jurisprudence, there were sufficient corroborating circumstances, in my opinion, to permit the subscribing witnesses to testify concerning the fatal defect of form (i. e., that the notary dictated the testament to his secretary and had her transcribe it) instead of writing it himself. For the reasons stated in our original majority opinion, I do believe that the testimony of the subscribing witnesses is sufficiently corroborated by reasonable inferences from the will itself.
Essentially, I am in accord with the reasons stated by Mr. Justice BARHAM in his dissent to the original opinionthat the requirement that the notary write the nuncupative will by public act should be reinterpreted in light of modern law-office practices, by which lawyer-notaries usually "write" by use of stenographers. This would, however, result in an unfortunate judicial postureessentially a minority opinion of this court, founded on no rule of law deductible for future guidance.
I am willing to sign the majority as a limitation upon Succession of Beattie and Talton v. Todd. Much as I dislike self-imposed arbitrary and mechanical rules which prevent a court from looking at the truth, I can, until these opinions are overruled, follow them as now further limited by the majority. Under this new limitation, judicial inference or deduction from the will itself cannot serve as the "independent facts or reasonable inferences" allowed to corroborate the testimony of subscribing witnesses that the formalities were not complied with.
*557 It does seem unfair to change prior judicial interpretations so as to defeat a contention, valid under them, of opponents to a will. Nevertheless, I do not believe that opponents to a will have any equitable right, based upon any reasonable expectations or natural principle, to a holding that a will, which solemnly declares the intention of the testator, be invalidated for technical defects, not really discoverable until after the testator's death.
Essentially, I believe that the nuncupative will by public act, with all its formalities, is too rigid a form to be truly useful. It is of some value for its self-proving nature, but the cost in will contests, and the availability of other and more flexible forms, outweighs, in my opinion, this usefulness. Unless the essentials of the form are reinterpreted, as suggested by my brother BARHAM, this code form must be regarded as made obsolete by modern office practices.
CALOGERO, Justice (dissenting).
I dissent, being of the opinion that our original opinion in this case is correct.
NOTES
[1] The legatees would enjoy almost the entire estate of Mrs. Killingsworth if the will is valid. They are also legal heirs, however, and will enjoy approximately 3/8 of Mrs. Killingsworth's estate if the will is invalid.
[2] These legal heirs would inherit nothing under the will, but will receive 5/8 of Mrs. Killingsworth's estate if the will is invalid.
[3] Civil Code of Louisiana, Article 1578.

The nuncupative testaments by public act must be received by a notary public, in presence of three witnesses residing in the place where the will is executed, or of five witnesses not residing in the place.
This testament must be dictated by the testator, and written by the notary as it is dictated.
It must then be read to the testator in presence of the witnesses.
Express mention is made of the whole, observing that all those formalities must be fulfilled at one time, without interruption, and without turning aside to other acts.
[4] It should be noted that the "ruling" being considered in the Day case, as to writs had earlier been denied, was on a question of fact, and not a question of law as is involved here.
[5] 150 La. 256, 90 So. 640 (1922).
[6] 96 So.2d at p. 329(Succession of Beattie)

"Testimony of subscribing witnesses which is adduced on the contest of the will and which, in effect, impeaches the solemn statements contained in the instrument which by their signatures they have attested as correct, is not in itself sufficient to overcome the presumption of validity arising from their presence and signatures and the official certificate of a public officer fortified by his oath. Their testimony must be corroborated by independent facts or reasonable inferences. * * *" (Emphasis ours.)
[7] Smith, Third Party Beneficiaries in Louisiana; The Stipulation Pour Autrui, 11 Tul. L.Rev. 18 (1936).
[8] By way of clarification of the promise which was to benefit the legatees, it was to place the legatees in a will which would be valid insofar as reasonable competence by the attorney-notary could guarantee. The benefit was not a guarantee that they would receive the legacies, but only a promise that they would be legatees under Mrs. Killingsworth's October 7, 1955 will. The negligence of the notary denied them the intended benefit of being named legatees under a valid will. The fact that his negligence meant the legatees were, in law, never legatees caused them harm. The measure of this harm is not known until the death of the testatrix. Had she changed her will so as to exclude these legatees then the harm suffered as a result of the notary's negligence would be negligible. Where, however, as here the testatrix does not undertake to change her will, then the negligence of the notary causes them harm, the loss of the intended legacies. The fact that the loss, or the extent thereof, is not established until the death of the testatrix will not alter the fact that the intended legatees were harmed (or at least not benefited) when the attorney-notary negligently breached the stipulation pour autrui by confecting an invalid will.
[9] The Court of Appeal properly noted, incident to its remanding the case to the District Court that the practice of law is an ordinary partnership (Jones v. Caperton & Weeks, 15 La.Ann. 475 (1860) and that while the partner tort feasor is liable for a plaintiff's full damages, the partner not a tort feasor is liable only for his virile share as a partner. Champagne v. Southern Farm Bureau Casualty Insurance Co., 170 So.2d 226, (La.App. 4th Cir. 1965) writs refused 247 La. 417, 171 So.2d 668 (1965). Since the judgment in the trial court, as it casts the various defendants for their respective and/or solidary sums is not in accord with the aforestated principle, it is expected that upon remand such judgments shall be re-couched appropriately.
[10] St. Paul has conceded coverage for Mr. Middleton and has defended him in this suit.
[11] See Footnote No. 1.
[12] See Footnote No. 9.
[*] See 1972 Compiled Edition of the Civil Codes of Louisiana, edited by Joseph Dainow, Article 1578 source provisions.
[1] These legal heirs were not named in the will. Thus, they would inherit nothing if the will is valid; however, if the will is invalid, they will receive five-eighths of Mrs. Killingsworth's estate.
[2] These legatees would enjoy practically the entire estate of Mrs. Killingsworth if the will is held valid. They are also legal heirs and, as such, would inherit three-eighths of Mrs. Killingsworth's estate if the will is invalid.